# United States Court of Appeals
## For the First Circuit

No. 04-2067

LIN UN,

Petitioner,

v.

ALBERTO GONZÁLES, Attorney General,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Selya, <u>Circuit Judge</u>,
Coffin, <u>Senior Circuit Judge</u>,
and Lynch, <u>Circuit Judge</u>.

<u>Valentine A. Brown</u> on brief for petitioner.
<u>Peter D. Keisler</u>, Assistant Attorney General, and <u>Mary Jane Candaux</u>, Senior Litigation Counsel, on brief for respondent.

July 21, 2005

---

[*]Alberto Gonzáles was sworn in as Attorney General of the United States on February 3, 2005. We have substituted him for John Ashcroft, previous holder of that office, as the respondent. <u>See</u> Fed. R. App. P. 43(c)(2).

**COFFIN, <u>Senior Circuit Judge</u>**.  Petitioner Lin Un,[1] a Cambodian citizen, seeks review of a final order of removal issued by the Board of Immigration Appeals (BIA) summarily affirming a decision of an Immigration Judge (IJ) denying four claims for relief.  Two of those claims are not before us: petitioner concedes that his asylum request was untimely and he has not addressed in his brief the IJ's denial of voluntary departure.  Petitioner challenges denial of his application for withholding of removal and also protection under the Convention Against Torture (CAT).

We conclude that we lack appellate jurisdiction to address the CAT issue because it was not raised in petitioner's Notice of Appeal to the BIA.  Our review of the full record persuades us, however, that we must remand the case for further consideration of the removal issue because the IJ failed to address whether petitioner was subject to past persecution, which would have entitled him to the regulatory presumption of a future threat to his life or freedom.  <u>See</u> 8 C.F.R § 1208.16(b)(1).

## I. Factual Background

Petitioner entered the United States on a visitor's visa in January 1997, leaving his wife and three children in Cambodia.  He overstayed his authorized time, and the Immigration and

---

[1] Although the record identifies petitioner as "Lin" Un, the correct spelling of his first name is "Len."

Naturalization Service (INS) initiated the removal proceedings that eventually resulted in the BIA order currently under review.[2]

Un's reason for leaving Cambodia arose out of his employment as a Guard Shift Supervisor at the U.S. Embassy in Phnom Penh. According to his employment contract, contained in the administrative record, he was one of three shift supervisors of a group of 350 security employees, with the responsibility of safeguarding U.S. government property and personnel in the Embassy compound and residential areas.

Petitioner told of two occasions when he was visited by men he thought were from the Cambodian Ministry of the Interior. The first visit occurred in August 1996. The men asked for secret information about the Embassy, specifically, information about the rooms in the building with bullet-proof walls and the number of new staff coming to work there. He did not provide that information.

Subsequently, on December 16, 1996, he was visited by two men, at least one of whom was in uniform, and he described the threat he received as follows:

> They told me that they will kill me with a gun, and they asked me to think about that, to think, to think what their request is and they don't ask for the, the answer on that specific day at all. They asked me to think

---

[2] On March 1, 2003, after the inception of this case but before the BIA's order, the INS ceased to exist as an independent agency. Many of its duties were transferred to U.S. Citizenship and Immigration Services, a bureau of the newly created Department of Homeland Security.

about it.  And if I refused it, they said that I will be killed.

Petitioner testified that he told the men that Embassy policy barred him from revealing such information to an outsider.  One of the men then told him to "sleep with it" and he would "let you know soon."  Some time later, a friend of petitioner, whom he believed, told him that he must go into hiding because they were "looking to kill you."

Petitioner's wife, though at home on these occasions, was excluded from the conversations to protect her from any reprisals.  Petitioner did not inform his superior in the Embassy about the attempts to enlist him as a spy, thinking that rumors might surface and someone in his family might be hurt.  Nor did petitioner, in applying for a visa, mention the incidents.

Petitioner produced a letter from his wife, dated September 4, 2000.  She wrote that, even after almost four years since petitioner left for the United States, "they" often come, yell at her, and threaten her, causing her and her children to sleep at friends' houses.  She reported that four men armed with pistols had come several days earlier and asked if her husband was at home or "hiding at work, at the American Embassy," and then searched every room in the house.  She also wrote that the children did not attend school regularly, since she and they were running away from home frequently.

## II. The Agency's Decision

The IJ, who had patiently conducted several hearings in this case, rendered an oral decision on March 19, 2003. She noted with apparent skepticism the fact that petitioner's passport was issued five days before he was threatened for the second time. Referring to a letter submitted by his Embassy supervisor, the IJ rejected the employer's conclusions concerning petitioner's motivation for coming to the United States and observed that petitioner had not mentioned any threats. Nonetheless, although she made no general finding of credibility, the IJ gave petitioner the benefit of the doubt and assumed that he had testified truthfully about the threats. She concluded, however, that even if petitioner's testimony were entirely true, "he has failed to establish objectively that it is more likely than not he would be harmed at this time if [he] returns to Cambodia." She reasoned that his employment with the Embassy had ended in January 1997 and he had not indicated that anyone would harm him at this time.

Without any additional findings, the IJ concluded that petitioner had also "not established that the government would detain him and subject him to torture." He was thus not eligible for protection under the CAT and was subject to removal to Cambodia. Finally, noting that petitioner had failed to tell his attorney or the court of an earlier application for asylum, the IJ

deemed petitioner to be a person unlikely to comply with any order and therefore denied voluntary departure.

The BIA affirmed without opinion on July 7, 2004.

### III. Discussion

Petitioner's key argument is that the IJ (and the BIA) failed to address one of the two avenues open to an applicant for proving entitlement to withholding of removal, i.e., whether he had suffered past persecution on account of one of five proscribed grounds (here, membership in a particular social group, U.S. Embassy employees). Under 8 C.F.R § 1208.16(b)(1)(I), captioned "Past threat to life or freedom," if such past persecution has been determined, "it shall be presumed that the applicant's life or freedom would be threatened in the future . . . ."

Once such a presumption is created, the task falls upon the government to establish by a preponderance of the evidence that fundamental changes have occurred that have removed any threat to an applicant's life or freedom or that relocation to another part of the proposed country of removal would be safer and reasonable. See 8 C.F.R § 1208.16(b)(1)(ii). Instead, as we have noted, the IJ imposed the burden on petitioner to demonstrate that he was more likely than not to be harmed if returned to Cambodia.

The government responds to these challenges by saying, first, that "the immigration judge's decision, when taken as a whole, indicated that petitioner did not establish past persecution in

order to effectuate the regulatory presumption of a future threat to his life or freedom." This is followed by the statement that "[s]ubstantial evidence supports that finding." This kind of argumentation is misleading. There is no issue here regarding the customary deference we owe to a finder of fact because there is no finding. The IJ's decision permits no interpretation other than that "past persecution" and its possible basis for a presumption were simply not addressed.

As we have made clear, we expect an agency to make findings, implicitly if not explicitly, on all grounds necessary for decision. <u>Gailius</u> v. <u>INS</u>, 147 F.3d 34, 44 (1st Cir. 1998). Although we were dealing with a petitioner's request for asylum in <u>El Moraghy</u> v. <u>Ashcroft</u>, 331 F.3d 195 (1st Cir. 2003), the procedural issue was identical in that the IJ had not addressed whether El Moraghy had suffered past persecution. We said:

> The absence of reasoned discussion of past persecution undercuts any meaningful review of the IJ's fear of future prosecution finding, because we do not know whether El Moraghy should have had the benefit of the regulatory presumption of fear of persecution based on prior events.

<u>Id.</u> at 204-05. Indeed, as we observed in <u>Hernandez-Barrera</u> v. <u>Ashcroft</u>, 373 F.3d 9, 25 (1st Cir. 2004), the failure to address past persecution in effect precludes "meaningful review" of both petitioner's entitlement to a presumption of fear of future persecution and the IJ's finding that petitioner had not

established that it was more likely than not that he would be harmed on return to Cambodia.

We could, of course, affirm if, even accepting petitioner's testimony as true, we nonetheless were compelled to hold either that the facts did not demonstrate past persecution or that evidence of changed circumstances overcomes the presumption of future persecution.

Unfortunately, however, as in El Moraghy, "[w]e cannot say the evidence compels a conclusion either way," 331 F.3d at 205. First, the evidence pointing to past persecution is that petitioner was visited at his home by agents of the Ministry of the Interior, who requested inside information about the Embassy. The 2001 State Department Country Report on Human Rights Practices for Cambodia reported that, while nominally the National Police of the Ministry of the Interior are under civilian control, they and other security forces "answer to persons within the CPP (Cambodian People's Party)" and members of the security forces have committed numerous human rights abuses. Allegations of politically motivated killings had increased.

Petitioner's initial confrontation with the agents was followed several months later by another visit and threat that petitioner would be killed if he refused to cooperate. A credible friend who worked in the Ministry confirmed that the agents were planning to kill him. Even after petitioner left the country, the

Ministry agents persisted in calling on his wife, and on at least one occasion, they searched his home and interrogated his family at gunpoint.

These facts present an explicit death threat with perhaps one or more implicit ones. Making the same assumption of truthfulness as the IJ for the purpose of this analysis, our question is whether the asserted death threats could be sufficient to establish past persecution.

It seems to us that credible verbal death threats may fall within the meaning of "persecution." We have indicated that a threat to life could amount to persecution. See Aquilar-Solis v. INS, 168 F.3d 565, 570 (1st Cir. 1999) ("[P]ersecution encompasses more than threats to life or freedom . . . ."). And at least one circuit has specifically so pronounced. In Andriasian v. INS, 180 F.3d 1033, 1042 (9th Cir. 1999), the court stated: "[T]he warning that the Andriasians would be killed if they did not leave Azerbaijan immediately . . . would by itself be sufficient to establish past persecution."[3] See also Miljkovic v. Ashcroft, 376 F.3d 754, 756 (7th Cir. 2004)("When discrimination reaches the level of physical violence or threats of violence, it becomes persecution."). The government offers no case authority to the

---

[3] The court in Andriasian noted that the warning "was made all the more credible by the fact that the Azeri thugs who issued the threat had just murdered Mr. Andriasian's neighbor in cold blood." 180 F.3d at 1042.

contrary. We thus conclude that a finding that petitioner has suffered no past persecution is not compelled by this record; assessing the credibility and significance of the evidence in the context of the entire record is a task for the IJ in the first instance. Cf. Bocova v. Gonzáles, No. 04-2175, slip op. at 8 (1st Cir. June 24, 2005) (noting that the BIA determines whether persecution has occurred "on an ad hoc, case-by-case basis").

A conclusion of harmless error alternatively would be possible if the record compelled a finding that any presumption of future threats was rebutted by "a fundamental change in circumstances such that [petitioner's] life or freedom would not be threatened." 8 C.F.R § 1208.16(b)(1)(A). The government has not made this argument, addressing only the converse issue (which assumes that petitioner bore the burden of proof) of whether there was substantial evidence supporting the IJ's finding that petitioner failed to establish the likelihood of harm if returned to Cambodia. We therefore conclude that we must remand this matter for consideration of the issue of past persecution.[4]

Petitioner's second claimed basis for relief is that the IJ and BIA erred in finding him ineligible for relief under the Convention Against Torture. But, as the government points out,

_____

[4] Should the IJ determine that threats rising to the level of persecution were made, the question remains whether petitioner has shown that the threats were made "on account of" one of the protected grounds. See, e.g., Rodriquez-Ramirez v. Ashcroft, 398 F.3d 120, 124 (1st Cir. 2005); 8 C.F.R. § 1208.16(b)(1).

-10-

this issue was not raised before the BIA. Although petitioner's Notice of Appeal indicated that a brief would be filed with the Board, none was forthcoming. And, though the Notice of Appeal listed nine reasons or grounds, none mentioned the CAT. In Athehortua-Vanegas v. INS, 876 F.2d 238, 240-41 (1st Cir. 1989), we recognized the limits to our authority, saying, "[b]ecause exhaustion is statutorily mandated, the requirement [of exhaustion of administrative remedies] is jurisdictional." In that case as in the one before us, there was no brief filed. In that case the issue in the Notice of Appeal was phrased only in "gauzy generality;" in this one, the CAT issue was not phrased in any terms.

Although petitioner might argue that this was a simple oversight and that the IJ had clearly dealt with the issue, we see no way of assuming jurisdiction simply because it would appear that the BIA could not have overlooked the missing issue. As we said in Athehortua-Vanegas, "[a]t the very least, a grievant must tell the Board what aspects of the IJ's decision he contends were wrong, and why," id. at 241. We have consistently taken this position. See, e.g., Makhoul v. Ashcroft, 387 F.3d 75, 80 (1st Cir. 2004); Ravindran v. INS, 976 F.2d 754, 761 (1st Cir. 1992).

The petition for review is granted, the order of removal is **vacated**, and the case is **remanded** to the BIA for further proceedings consistent with this opinion.