# United States Court of Appeals
## For the First Circuit

No. 21-1296

LIBAN ABDI ALI,

Petitioner,

v.

MERRICK B. GARLAND,

Attorney General, Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, <u>Chief Judge</u>,
Gelpí, <u>Circuit Judge</u>,
and Katzmann,[*] <u>Judge</u>.

Edgar L. Fankbonner, with whom Susan B. Church, Goldberger & Dubin, PC, and Demissie & Church were on brief, for petitioner Ali.
Michele Y. F. Sarko, Trial Attorney, Office of Immigration Litigation, U.S. Department of Justice, with whom Brian Boynton, Acting Assistant Attorney General, Civil Division, and Andrew N. O'Malley, Senior Litigation Counsel, were on brief, for respondent Garland.

May 5, 2022

---

[*] Of the United States Court of International Trade, sitting by designation.

BARRON, Chief Judge. Before us is a petition for review from Liban Abdi Ali ("Ali"), in which he challenges a ruling by the Board of Immigration Appeals ("BIA") that affirmed the denial of his request for deferral of removal pursuant to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). We grant the petition in part, vacate the decision of the BIA in part, and remand to the BIA for further proceedings consistent with this opinion.

**I.**

Ali is a noncitizen who arrived in the United States in 2000. He was then approximately nine years old. Ali was granted asylum in 2002.

Almost two decades later, on March 3, 2020, the U.S. Department of Homeland Security served Ali with a Notice to Appear ("NTA") for removal proceedings pursuant to 8 U.S.C. § 1229a. The NTA charged that Ali was a noncitizen from Somalia who had not been "admitted or paroled" in the United States.[1] It alleged that although Ali had been granted asylum on February 23, 2002, he was subject to removal from the United States pursuant to 8 U.S.C. §§ 1182(a)(2)(A)(i)(II) and 1182(a)(2)(C) based on his prior

---

[1] Ali claimed that he was a citizen and national of Kenya, but through counsel at his removal hearing, "stipulate[d] to" being a citizen of Somalia.

- 2 -

Massachusetts state law convictions for drug-related crimes and purported activities in relation to the trafficking of cocaine.[2]

At a master calendar hearing on April 1, 2020, Ali, through his counsel, denied "the two charges of removability." The Immigration Judge ("IJ") at the hearing "sustain[ed]" the allegations in the NTA and "sustain[ed] the charges of removability." Ali, through his counsel, indicated his intent to apply for various forms of relief from removal.

A removal hearing was scheduled first for April 14, 2020. Ali submitted to the IJ an Application for Asylum and for

---

[2] 8 U.S.C. § 1182(a)(2)(A)(i)(II) makes "inadmissible,"

> [e]xcept as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21).

8 U.S.C. § 1182(a)(2)(C)(i) makes "inadmissible,"

> [a]ny alien who the consular officer or the Attorney General knows or has reason to believe is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 802 of Title 21), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so.

- 3 -

Withholding of Removal ("Form I-589"), to which he attached a declaration in support of his application for withholding of removal and protection under the CAT. Ali specified on the Form I-589 and in the declaration that he sought withholding of removal pursuant to 8 U.S.C. § 1231(b)(3) based on the persecution that he contended that he would be subject to in Somalia and pursuant to the CAT based on the torture that he contended that he would be subject to there, see 8 U.S.C. § 1231 note; 8 C.F.R. § 1208.16. In support of these contentions, Ali submitted to the IJ amended versions of both his Form I-589 and declaration as well as various supplemental exhibits.[3]

Ali's removal hearing was held on June 18, 2020. Following the removal hearing, the IJ "sustain[ed] the charges in the [NTA] by clear, convincing, and unequivocal evidence."

The IJ explained that in 2017, Ali was convicted of one charge of trafficking in more than eighteen and less than thirty-

---

[3] The Form I-589 also constituted a request for asylum. Ali's counsel explained at Ali's removal hearing, however, that Ali was "ineligible for asylum" because he had "criminal convictions that disqualif[ied]" him and because his application for asylum was "untimely." Ali's counsel clarified, though, that Ali continued to pursue a claim for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3) and for protection from removal pursuant to the CAT. Ali's counsel agreed during that proceeding that if Ali had committed "a particularly serious crime, that would bar him" from being eligible for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3). His counsel maintained, however, that in that event, Ali still would be eligible for some form of protection from removal pursuant to the CAT.

six grams of cocaine, see Mass. Gen. Laws ch. 94C, § 32E(b), two charges of possession of a large capacity firearm, id. ch. 269, § 10(m), eight charges of carrying a licensed firearm while under the influence, id. ch. 269, § 10H, one charge of receiving stolen property over $250, id. ch. 266, § 60, one charge of conspiracy to violate provisions of the Massachusetts Controlled Substances Act, id. ch. 94C, § 40, and one charge of possession of a firearm while committing a felony, id. ch. 265, § 18B. The IJ further found that Ali had been sentenced in state court to serve concurrently terms of imprisonment of three years and six months for each of the first three convictions, and that he had been "sentenced to probation for two years" for the remaining convictions, although it was "unclear whether or not it was served during the sentence or after the sentence."

The IJ then turned to Ali's request for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3) based on his claimed fear of persecution in Somalia. The IJ denied the request on the ground that Ali had been convicted of a "particularly serious crime" and so was statutorily ineligible for such protection. See 8 U.S.C. § 1231(b)(3)(B)(ii) (making ineligible for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3)(A) any noncitizen who "the Attorney General decides" is, "having been convicted by a final judgment of a particularly serious crime," a "danger to the community of the United States"). The IJ also denied the request

- 5 -

on the merits of the claim that he would be subject to persecution in Somalia.

Finally, the IJ addressed Ali's claim for protection from removal pursuant to the CAT. A noncitizen who has been convicted of a "particularly serious crime" and is therefore not eligible for withholding of removal based on a claim of persecution pursuant to 8 U.S.C. § 1231(b)(3) may still be entitled to what is known as "deferral of removal" if the noncitizen can show that he is "entitled to protection under the [CAT]." 8 C.F.R. § 1208.16(c)(4); see also Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105-277, 112 Stat. 2681, 2681-822. To make that showing, the noncitizen must demonstrate that he "is more likely than not to be tortured in the country of removal." 8 C.F.R. § 1208.16(c)(4).

The IJ determined that Ali was not entitled to deferral of removal pursuant to the CAT because Ali had not met his burden to "show[] it is more likely than not based on the evidence before the [c]ourt that he would be tortured in the proposed country of removal." The IJ then ordered Ali "removed to Somalia." (capitalization altered).

Ali appealed the IJ's rulings to the BIA, which affirmed the IJ. Ali then filed on April 14, 2021 this petition for review of the BIA's decision.[4]

The next day, Ali filed a motion to stay his removal pending resolution of his petition, which this Court denied on June 7, 2021. This Court did so on the ground that Ali's motion to stay had failed to make the "strong showing that he is likely to succeed on the merits" of his petition. Nken v. Holder, 556 U.S. 418, 426 (2009). The government then notified this Court that it did not intend to remove Ali prior to September 15, 2021. Ali represented in a brief filed with this Court on August 9, 2021, that he was at that time detained by U.S. Immigrations and Customs Enforcement.

**II.**

Ali focuses his briefing to us on the BIA's ruling affirming the IJ's ruling denying Ali deferral of removal pursuant to the CAT. Ali contends that the BIA erred in that ruling by affirming the IJ's rejection of each of the three distinct grounds for granting CAT-based deferral of removal that Ali had advanced.[5]

---

[4] The BIA considered Ali's amended brief to the BIA, and that is the filing to which we refer in this opinion.

[5] Because Ali does not in this appeal develop any argument to challenge the IJ's finding, affirmed by the BIA, that he committed a "particularly serious crime" and was therefore ineligible for withholding of removal, except to state in the "Summary of Argument" section of his brief to us that "the IJ

The first ground is that Ali will be tortured by members of al-Shabaab -- which the BIA described as an "armed terrorist organization" -- and that the government of Somalia will be willfully "blind" to such abuse. The second ground is that he will be tortured by "private militias" and "armed criminals" in Somalia and that the government of Somalia will be "willfully blind" to that abuse as well. The final ground is that he will be tortured "at the hands of Somali security forces."

Ali contends that the BIA erred in affirming the IJ's ruling as to each of these three grounds because the IJ violated 8 C.F.R. § 1208.16(c)(3). That regulation provides that "[i]n assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal," 8 C.F.R. § 1208.16(c)(3) -- a determination the IJ "shall first" make in its consideration of a claim of protection under the CAT, id. § 1208.16(c)(4) -- "all evidence relevant to the possibility of future torture shall be considered," id. § 1208.16(c)(3). Ali also contends that the agency's denial of his various grounds for CAT-based protection is not supported by substantial evidence once the evidence that he argues that the IJ failed to consider is taken

---

erroneously found that [his] criminal convictions were for particularly serious crimes," we do not review that determination here. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner . . . are deemed waived.").

into account. See DeCarvalho v. Garland, 18 F.4th 66, 74 (1st Cir. 2021) ("We will uphold the BIA's findings 'if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole."' A BIA decision lacks the support of substantial evidence when the record compels a conclusion contrary to the one reached by the agency." (quoting Agustin v. Whitaker, 914 F.3d 43, 45 (1st Cir. 2019))).

The government responds by contending that both the IJ and the BIA considered the evidence in question and that substantial evidence supports the BIA's affirmance of the IJ's denial of Ali's request for CAT-based relief. As we will explain, we deny Ali's petition for review of the BIA's ruling insofar as the petition challenges the BIA's affirmance of the IJ's denial of Ali's al-Shabaab-related ground for obtaining CAT-based deferral of removal. However, we grant Ali's petition for review with respect to his challenges to the BIA's affirmance of the IJ's ruling denying him CAT-based deferral of removal on the other two grounds at issue -- that Ali will be subject to torture in Somalia at the hands of private militias and armed criminals (which he refers collectively in his briefing to us as "other private actors") and that he will be subject to torture at the hands of the security forces of the government of Somalia.

- 9 -

**A.**

An applicant for deferral of removal pursuant to the CAT must establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); see also Ramírez-Pérez v. Barr, 934 F.3d 47, 52 (1st Cir. 2019). To make a showing that meets the definition of torture in 8 C.F.R. § 1208.18(a), a noncitizen must

> offer specific objective evidence showing that he will be subject to: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

Mazariegos v. Lynch, 790 F.3d 280, 287 (1st Cir. 2015) (emphasis removed) (quoting Romilus v. Ashcroft, 385 F.3d 1, 8 (1st Cir. 2004)). The definition of "torture" includes "mental pain or suffering" that is "caused by or resulting from," among other things, "[t]he threat of imminent death" and "[t]he intentional infliction or threatened infliction of severe physical pain or suffering." 8 C.F.R. §§ 1208.18(a)(4)(i), (iii).

The BIA reviews the immigration judge's fact-finding for clear error, and its legal determinations "de novo." DeCarvalho, 18 F.4th at 73; see also Matter of Z-Z-O-, 26 I. & N. Dec. 586, 590-91 (BIA 2015). This Court has jurisdiction to review a noncitizen's factual and legal challenges to a denial of relief

- 10 -

pursuant to the CAT, or "CAT order," see Nasrallah v. Barr, 140 S. Ct. 1683, 1690 (2020); 8 U.S.C. §§ 1252(a)(1), 1252(a)(4), 1231 note.

We review findings of fact that the BIA has affirmed under "the substantial-evidence standard." Nasrallah, 140 S. Ct. at 1692 (citing 8 U.S.C. § 1252(b)(4)(B)). Under that standard, "we will not disturb such findings if they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Yong Gao v. Barr, 950 F.3d 147, 151 (1st Cir. 2020) (quoting Ramírez-Pérez, 934 F.3d at 50).

We review questions of law "de novo, 'with appropriate deference to the agency's interpretation'" of any relevant statutes or regulations. Ramírez-Pérez, 934 F.3d at 50 (quoting Rivas-Durán v. Barr, 927 F.3d 26, 30 (1st Cir. 2019)). Where, as here, the BIA has affirmed the IJ's ruling by "includ[ing] discussion of some of the IJ's bases for decision, we review both the IJ's and BIA's opinions." Bonnet v. Garland, 20 F.4th 80, 84 (1st Cir. 2021) (quoting Chanthou Hem v. Mukasey, 514 F.3d 67, 69 (1st Cir. 2008)).

**B.**

We start with the contention that the BIA erred in affirming the IJ's ruling that Ali failed to meet his burden to show that he is entitled to deferral of removal pursuant to the CAT because he will be "torture[d] by [a]l-Shabaab" and the

- 11 -

"security forces" of the government of Somalia will "turn a blind eye" to that torture. We see no merit to this contention, given what the record supportably shows about the efforts that the government of Somalia is making to counter al-Shabaab and the specific arguments that Ali made to the IJ.

The IJ did not dispute that Ali put forth evidence that supportably shows that al-Shabaab would target Ali for torture if he were removed to Somalia or that al-Shabaab would do so because Ali would be a criminal deportee who was "westernized." The IJ nonetheless ruled that Ali's request for deferral of removal failed because "any threat to [Ali] from al-Shabaab is not by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity" as al-Shabaab is a group "in fact in armed conflict with the government of Somalia." The IJ further explained that "[w]hether that armed conflict is successful by the government of Somalia is not germane" to Ali's request for CAT-based deferral of removal because what mattered was that "[t]he government of Somalia does not condone and is in fact, again, as I said, in armed conflict with al-Shabaab."

The BIA, for its part, affirmed the IJ's ruling on this score. The BIA explained that "the evidence show[ed] [that] the Somali government is actively fighting to control that armed terrorist organization" and thus that Ali had "not shown that the

- 12 -

Somali government has willfully turned a blind eye to [al-]Shabaab's activities." The BIA cited in support of that conclusion two cases, one from this Court and one from the Eighth Circuit, regarding what must be shown to establish governmental acquiescence in torture. See Ramírez-Pérez, 934 F.3d at 52 (affirming BIA's rejection of a claim that Guatemalan authorities would acquiesce in any torture committed by gang members); Hassan v. Rosen, 985 F.3d 587, 590 (8th Cir. 2021) (observing that noncitizen's "assertion that the Somali government and [a]l-Shabaab act in concert to torture people is wholly without record support").

In petitioning for review of the BIA's ruling, Ali does not dispute to us that the record supportably shows that -- as the IJ found and the BIA affirmed -- the government of Somalia is actively engaged in an armed conflict with al-Shabaab. But, Ali argues, his al-Shabaab-related ground for CAT-based deferral of removal still has merit.

In explaining why, Ali first contends that he is entitled to CAT-based protection from removal based on the torture that he maintains that he will be subjected to by al-Shabaab "[i]rrespective of the Somalian government's political efforts to 'control' [a]l-Shabaab." That is so, Ali contends, because "the evidence shows that the Somalian government is unwilling to stop [a]l-Shabaab from torturing" Ali in particular as he "himself is

- 13 -

considered an undesirable person."[6]  Ali then goes on to contend that, because that is so, the BIA erred in affirming the IJ's rejection of his al-Shabaab-related ground for deferral of removal because the IJ failed to grapple with the evidence in the record that Ali contends is germane to the contention that authorities of the government of Somalia will turn a blind eye to al-Shabaab's abuse of him precisely because of the hostility of those authorities to Westernized criminal deportees such as himself.

The problem for Ali in pressing this basis for challenging the BIA's ruling is that he did not advance to the IJ with any clarity this more nuanced version of his al-Shabaab-related ground for deferral of removal, which he now contends the IJ erred in denying on the ground that the IJ ignored evidence directly relevant to it.  See Makhoul v. Ashcroft, 387 F.3d 75, 81 (1st Cir. 2004) ("Because he neglected to raise the 'social group' issue before the IJ, that issue is procedurally defaulted.").

To be sure, Ali did introduce at his removal hearing written and oral testimony from an expert witness, Mary Harper, who had experience reporting from Somalia and was the BBC News's

---

[6] Ali points out in his briefing to us, as he did in the brief that he submitted to the BIA, that he presented evidence that the Somalian federal government exists only "nominally" and that it "has no power outside of certain parts of the capital region."  But, Ali has not developed any argument in this appeal or below that al-Shabaab can be properly understood to constitute a government actor in those areas.

- 14 -

"Somalia Analyst." And, Ali is right that Harper did state in her oral testimony that al-Shabaab targeted westernized criminal deportees for abuse because such deportees "personif[y] everything that" al-Shabaab "despise[s]." Moreover, Ali also submitted to the IJ a written statement from Harper that stated that government authorities in Somalia "have displayed hostility to the idea of people with a history of criminal convictions being deported to Somalia," whom they view as "undesirables."

Harper did not, however, assert with any clarity in her testimony that even though the government of Somalia was engaged in an armed conflict with al-Shabaab, it would exhibit -- either through its security forces or its governmental personnel more generally -- willful blindness to the abuse of westernized criminal deportees when al-Shabaab in particular was responsible for that abuse even though it otherwise would not ignore such abuse. Thus, it is not as if it were clear from Harper's testimony that Ali was advancing the more nuanced al-Shabaab-related ground for obtaining deferral of removal pursuant to the CAT that he now contends to us that he pressed to the IJ.

That said, we do recognize that Ali's counsel did assert at the removal hearing that the government of Somalia "is willfully blind in [al-Shabaab's] malfeasance." But, Ali's counsel did not in making that statement develop any argument as to how the evidence in the record could support such a finding if the evidence

- 15 -

in the record sufficed to show -- as Ali does not dispute it does -- that the government of Somalia is actively fighting al-Shabaab for control of the country.

Thus, given what the record shows about the specific argument that Ali made to the IJ, we cannot say that the IJ, in finding the evidence of armed conflict between the government of Somalia and al-Shabaab to be preclusive of Ali's al-Shabaab-related ground for deferral of removal, "ignored" or otherwise failed to consider evidence that bears on the ground for deferral of removal that Ali advanced. Rather, the record shows that the IJ rejected Ali's al-Shabaab-related ground for granting deferral of removal to him because there was substantial evidence that refuted his attempt to show that the government of Somalia would acquiesce in the abuse that he would face in that country at the hands of al-Shabaab -- namely, the evidence of the government of Somalia's ongoing armed conflict with that organization. Accordingly, we cannot say that Ali has shown that the BIA erred in affirming the IJ's rejection of Ali's al-Shabaab-based ground for deferral of removal, because we conclude that the BIA supportably ruled that the IJ did not clearly err in making that record-based ruling concerning whether Ali had shown that the government of Somalia would acquiesce in the abuse by al-Shabaab to which he claimed he would be subjected.

We next take up Ali's challenge to the BIA's ruling affirming the IJ's rejection of what Ali describes as his "other private actors"-related ground for obtaining deferral of removal pursuant to the CAT. Ali contends that the BIA "erroneously affirmed" the IJ's decision rejecting this ground because the IJ "failed to consider" and to "account for" evidence pertaining to it that he presented through both Harper's testimony at his removal hearing and one of her written declarations. Here, Ali once again relies both on 8 C.F.R. § 1208.16(c)(3)'s requirement that "[i]n assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered," and the requirement that the agency's factual findings be supported by substantial evidence, see DeCarvalho, 18 F.4th at 74.

Ali also contends that, at least once the evidence that he asserts was not considered is put into the mix, the record does not contain substantial evidence that could support a finding that he failed to make out a CAT-based claim for deferral of removal based on the harm that would be visited upon him by these "other private actors." Thus, he asks us to vacate the BIA's ruling for this reason as well.

We start by describing the evidence that Ali contends that he put forth at his removal proceedings in support of this

- 17 -

"other private actors"-related ground for securing CAT-based protection that the IJ "failed to consider." We first describe the testimony that Harper provided at his removal hearing. We then describe the declaration from her that Ali submitted to the IJ as part of his removal proceedings that he contends that the IJ also failed to consider.

Harper began her testimony at Ali's removal hearing by stating that Ali would "be at great threat if he was returned to Somalia." She then clarified that the "threat" to which she referred "would come from" not only al-Shabaab and the security forces of the government of Somalia, but also from "members of private militias" and "individuals who are armed criminals." Harper testified as well that Ali would face that threat from those actors due to his appearance and other "characteristics" that marked him as a westernized criminal deportee.

Later, Harper described in her testimony the nature of the "great threat" that she believed Ali would encounter if he were removed to Somalia at the hands of "the security forces, criminal groups and al-Shabaab among others" (emphasis added). To be sure, Harper did testify about the abuse that she believed Ali would face at the hands of al-Shabaab and the security forces of the government of Somalia. But, the record reveals that before she began her testimony concerning al-Shabaab or security forces, Ali's counsel asked her to describe other forms of abuse that she

- 18 -

had "witnessed . . . being inflicted upon individuals in Somalia who meet those characteristics," and Harper answered by describing abuse that she did not attribute to either al-Shabaab or the security forces. In that testimony, Harper described the victims of the abuse being "kept" in a mental hospital "almost as prisoners" as well as being "beat[en]." That testimony also included her broader statement that she believed that Ali "would face threats or death or some kind of difficult violence" if returned to Somalia.

In addition to the testimony just described, Harper also provided some testimony that is relevant to a finding of government acquiescence in abuse that is not attributable to either al-Shabaab or security forces. Specifically, Harper was asked whether "the authorities in Mogadishu or in Somalia in general . . . intervene," and whether "law enforcement" will "protect them from this type of harm." She responded that people like Ali would "get absolutely no help from the security officers" -- which she appeared to understand as government "authorities" to whom one would turn to for assistance. She explained further that people like Ali would not get such help because the "security forces" in Somalia are themselves "often the people who are carrying out this kind of physical abuse on such people" and are focused on "trying to protect themselves from al-Shabaab and other groups."

We now turn to the declaration from Harper, which Ali contends also was not considered by the IJ but which he contends contained evidence that supports his "other private actors"-related ground for deferral of removal based on the CAT. Ali explains that in this declaration Harper described "her observations of conditions in Somalia as recently as March 2020."

We will refer to this document as the March 2020 declaration. In the declaration, Harper described other forms of abuse that Ali would face in Somalia that she did not attribute to either al-Shabaab or to the security forces of the government of Somalia. The record shows that the declaration referred, for example, to the "proliferation of armed groups in Somalia," including "'armed clan militias'" and "'[p]olitical militias.'" (emphasis and citation omitted). And, Ali highlights, as he did in his brief to the BIA, a portion of that declaration that stated that individuals "deported back to Mogadishu . . . . are generally seen as spies by the locals in Somalia," and that two such repatriated individuals were "'killed in Mogadishu due to the suspicions of being a spy.'" (citation omitted).

The March 2020 declaration also contained statements relevant to a finding of government acquiescence, as the declaration quoted a "former government minister" who stated that "'[d]eportees with a criminal past'" are "'suspected by the Somali government of being law-breakers.'" (citation omitted). It stated

further that Harper had spoken to "government officials" who "have displayed hostility" to criminal deportees to Somalia and viewed them as "undesirables."

The IJ ruled that Ali was not entitled to deferral of removal pursuant to the CAT on any of the grounds that he pressed. But, the IJ did not refer to any of the evidence from Harper's testimony or the March 2020 declaration that we have just described concerning the abuse to which Ali contends that "other private actors" would subject him.

To be sure, the IJ did refer in his opinion to Harper's "testimon[y]." But, the IJ did so only by referring to her statements in that testimony about "the threat from al-Shabaab," and "the threat from the security forces." The IJ made no mention of the testimony that Harper gave that pertained to the threat of abuse that Ali would face at the hands of "armed criminals" and "members of private militias."[7]

_____

[7] The IJ did, as we describe in Part II.D below, also explain in his opinion that the "motivation" of the security forces of the government of Somalia who "mean[] to do the respondent harm" indicated that those security forces would not be acting "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." See 8 C.F.R. § 1208.18(a)(1) ("Torture is defined as . . . pain or suffering . . . inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity."). The government does not argue, however, that this portion of the IJ's opinion concerning the lack of acquiescence by the government of Somalia in the abuse that Ali contended he would

- 21 -

The IJ did note in its opinion that Harper had made "written statements," which we understand to be a reference to Harper's March 2020 declaration that contained that evidence. But, there is no indication from the face of the IJ's opinion that the contents of that declaration concerning the threat of abuse from "other private actors" that would bear on Ali's request for deferral of removal pursuant to the CAT were given any consideration.

The government acknowledges the requirement for an immigration judge to "consider[]" "all relevant evidence" of torture in the regulation on which Ali relies. See 8 C.F.R. § 1208.16(c)(3). But, the government contends that the BIA did "consider[]" Ali's argument to it that the IJ ignored the evidence from Harper described above and affirmed the IJ's ruling nonetheless. In doing so, the government notes that "the BIA is not required 'to dissect in minute detail every contention that a complaining party advances,' or to discuss each piece of evidence proffered." Li Sheng Wu v. Holder, 737 F.3d 829, 833 (1st Cir. 2013) (quoting Raza v. Gonzales, 484 F.3d 125, 128 (1st Cir. 2007) (citation omitted)). The government then adds that the BIA

face at the hands of security forces may also have been a basis on which the IJ considered and rejected his "other private actors"-related ground for CAT-based deferral of removal. Nor did the BIA appear to rely on any such determination in rejecting that ground.

- 22 -

"reasonably agreed" with the IJ's ruling that Ali had not shown what he must as to this ground for securing CAT-based protection.

The government is right that the BIA did purport to affirm the IJ's denial of Ali's entitlement to deferral of removal based on what it described as his "claim[] [of] a likelihood of torture" at the hands of "others" -- which, in the context of the BIA's opinion as a whole and his briefing to the IJ, appears to be a ruling affirming the IJ's rejection of Ali's "other private actors"-related ground for deferral of removal. But, the BIA did not describe the IJ as having considered and rejected Harper's testimony or March 2020 declaration concerning the abuse he would be subject to by such actors. Instead, the BIA based its decision to affirm the IJ as to this "other private actors"-related ground entirely on the following basis: though Ali "claim[ed] a likelihood of torture" from "others" and

> will undoubtedly be at some risk of harm in Somalia, which may include harassment, ostracization, or even beatings, . . . we agree with the [IJ's] finding, after considering the risk of torture from all sources in the aggregate, that [Ali] has not shown a likelihood of torture. 8 C.F.R. § 1208.18(a)(3) ("Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.").[8]

---

[8] We note that although the BIA included a citation to 8 C.F.R. § 1208.18(a)(3) in the passage of its opinion that we quote here, it quoted the language that instead appears in 8 C.F.R.

- 23 -

That holding by the BIA does not show, however, that the BIA determined that the IJ had considered Ali's evidence from Harper supporting Ali's "other private actors"-related ground for removal and found that evidence wanting. And that is because the IJ did not make the finding with which the BIA purported to be "agree[ing]." In fact, the IJ did not make any finding as to the severity of the abuse that Ali would face at the hands of "other private actors." Indeed, as we have noted, the IJ did not even mention that ground for granting him CAT-based removal in denying him such protection.

Thus, it follows that the BIA's ruling affirming the IJ with respect to this "other private actors"-related ground for deferral of removal does not address whether the IJ considered the evidence from Harper concerning the abuse to which those actors would subject Ali that Ali contends that the IJ failed to consider. Nor can we say on this record that the IJ did give that evidence from Harper any consideration, such that there would be no reason for us to remand to the BIA based on the IJ's failure to have done

§ 1208.18(a)(2), and so that is the regulatory provision on which we understand it to have relied in denying Ali's claim. Compare 8 C.F.R. § 1208.18(a)(2) ("Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture."), with id. § 1208.18(a)(3) ("Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. . . .").

so. For, while it is true that, as we have explained, the IJ made reference to Harper's testimony and the March 2020 declaration (albeit indirectly), there is no indication that the IJ gave any consideration at all to the evidence directly bearing on the abuse to which Ali contended that "other private actors" would subject him that is contained in either Harper's testimony or the March 2020 declaration.[9]

The government does separately contend that we must deny Ali's petition challenging the BIA's ruling because, in citing to the definition of torture in the passage of its opinion we quoted earlier, the BIA was purporting to affirm a factual determination by the IJ "that [Ali] had not shown that it is more likely than not that he would be subjected to harm rising to the level of torture by . . . others" rather than a factual determination regarding the severity of any such abuse. But, there is no basis in the IJ's opinion for concluding that the IJ made that probabilistic finding either. And, in any event, the BIA in the passage of its opinion in which it purported to be agreeing with

---

[9] To the extent that the government means to contend that the BIA itself considered the Harper evidence in question because of the portion of the BIA's opinion in which the BIA states, "after considering the risk of torture from all sources in the aggregate," we cannot agree. In context, that statement in the BIA's opinion concerns only what the BIA determined that the IJ considered in making the finding about the severity of the abuse that Ali would face from "other private actors" that the BIA attributed to the IJ. But, as we have explained, the IJ made no such finding.

- 25 -

the IJ's finding quoted from the portion of the relevant regulations that concern how severe abuse must be to constitute "torture," see 8 C.F.R. § 1208.18(a)(2), rather than the portion of those regulations that addresses how "likely" it must be that the noncitizen will be subjected to abuse that is severe enough to constitute torture, see id. § 1208.16(c)(4). See also Patel v. Holder, 707 F.3d 77, 80 n.1 (1st Cir. 2013) (explaining that "our review is limited to the reasoning articulated below"); Makieh v. Holder, 572 F.3d 37, 41 (1st Cir. 2009) ("[W]e should 'judge the action of the BIA based only on reasoning provided by the agency.'" (quoting Mihaylov v. Ashcroft, 379 F.3d 15, 21 (1st Cir. 2004))).

The government is right that the BIA need not "'dissect in minute detail every contention that a complaining party advances.'" Wu, 737 F.3d at 833 (quoting Raza, 484 F.3d at 128). But, the BIA did not address Ali's contention that the IJ failed to consider relevant evidence concerning the torture that he would face from private militias and armed criminals. And that is so, even though the record shows that IJ failed to consider that evidence. Nor can we say that the failure to consider that evidence was harmless, given how directly the body of evidence in question bears on Ali's "other private actors"-related ground for deferral of removal based on the CAT. See Un v. Gonzales, 415 F.3d 205, 209 (1st Cir. 2005) (observing that "[w]e could, of course, affirm if, even accepting petitioner's testimony as true,

- 26 -

we nonetheless were compelled to hold" that "the facts did not demonstrate" past or future persecution). Thus, we must vacate and remand the BIA's ruling affirming the IJ's denial of this ground for granting Ali deferral of removal.

## D.

We turn finally to Ali's contention that the BIA "erroneously affirmed" the IJ's ruling denying his request for deferral of removal pursuant to the CAT based on the torture that he contends that he will be subjected to in Somalia at the hands of the security forces of the government of Somalia. Once again, Ali relies on 8 C.F.R. § 1208.16(c)(3)'s requirement that the agency "consider" "all evidence relevant" to his request for deferral of removal pursuant to the CAT, as he contends that the IJ "ignored" or "failed to address" the evidence of deportees to Somalia being tortured by the security forces of that country that Ali introduced through Harper's testimony at his removal hearing and through the documentary evidence that he presented to the IJ in support of his application. In addition, Ali once again relies on what he contends is a lack of substantial evidence in the record to support the BIA's affirmance of the IJ's denial of this "security forces"-related ground for CAT-based deferral of removal once the assertedly overlooked evidence is taken into account.

In assessing the merits of this aspect of Ali's challenge to the BIA's ruling, we begin by reviewing the testimony from

Harper that Ali contends that the IJ ignored and that bears on Ali's "security forces"-related ground for CAT-based protection. We then describe the evidence from Harper's March 2020 declaration that Ali contends that the IJ ignored, and that further bears on Ali's "security forces"-related ground for deferral of removal.

Ali contends that Harper described, in her testimony at his removal hearing, the abuse that he would face at the hands of the security forces of the government of Somalia. Harper explained at that hearing that the security forces "pose a very, a very grave threat to him because of his particular characteristics that I've outlined already." Harper explained further in her testimony that she had "kept track of some people who ha[d] been returned from the U.K. and from Kenya and some of those individuals, young males, highly westernized have been either physically beaten or threatened or arrested by security forces." She further explained that the security forces "turned on" such individuals because they viewed such individuals as "threatening to Somali society."

Ali does not dispute that the IJ referred in his opinion to Harper's testimony concerning the threat that Ali faced at the hands of security forces. But, Ali contends, the IJ "disregarded" that testimony nonetheless. As support for that contention, Ali points to the IJ's statement in his opinion that Harper "testified" about the threat of abuse that Ali would face from the security forces "almost as an afterthought."

Ali goes on to contend that the IJ also "disregarded" the content of Harper's March 2020 declaration, which Ali describes as a document that specifically "emphasize[s] the indiscriminate violence practiced by Somalia's official security forces." As Ali pointed out to the BIA, Harper in that March 2020 declaration asserted that if Ali were removed to Somalia, he could in her opinion, because of his characteristics and as others had been, be "killed and wounded," "abus[ed]," and "beat[en] . . . to the ground" at the hands of those security forces -- which, we note, the IJ in his opinion "[a]ssum[ed] . . . represent the government of Somalia." And, Ali also points out to us in his petition for review that a portion of that declaration further stated that "there exists a danger of being shot by security forces . . . who are extremely jumpy in Somalia, including Mogadishu, partly because they are expressly targeted by [al-Shabaab]," and provided as an example that "members of the minority Somali Bantu community, many of whom were . . . forcibly returned from the U.S. to Somalia, have been detained, tortured, . . . or otherwise abused by Somali security personnel at Mogadishu International Airport" (emphasis added).

The government responds that the BIA "considered" Ali's contention that the IJ "disregarded Harper's March 2020 declaration" and rejected it. It then further contends that "the BIA reasonably agreed with the IJ's conclusion that Ali had not

shown a more likely than not chance that he would be tortured" by security forces in Somalia.

But, in affirming the IJ's denial of Ali's security forces-based claim for deferral of removal, the BIA relied entirely on the same ground on which it relied in affirming the IJ's denial of Ali's ground for requesting deferral of removal based on the torture that Ali contended that he would be subjected to by what the BIA described as "others" and that we addressed above -- namely, on the ground that the IJ did not err in finding that the abuse to which Ali had shown that he would be subjected if he were removed to Somalia was not severe enough to constitute torture. And that is problematic because, as we have explained, the IJ did not make any such finding. Thus, we cannot say that the BIA properly affirmed a finding by the IJ that Ali had not met his burden to show that he would likely be tortured by security forces in Somalia that was supported by substantial evidence, because the only finding by the IJ with which the BIA purported to "agree" was one that the IJ did not make.[10]

The government does again urge us to construe the BIA as having merely affirmed a finding that it attributed to the IJ

_____

[10] For this reason, we need not resolve whether, as Ali contends, the IJ violated 8 C.F.R. § 1208.16(c)(3) by failing to consider all relevant evidence through the way the IJ treated the evidence from Harper in her testimony and March 2020 declaration that bears on Ali's "security forces"-related ground for CAT-based deferral of removal.

regarding whether it was "more likely than not" that Ali would be subject to abuse severe enough to constitute torture rather than a finding that it attributed to the IJ regarding the limited severity of the abuse that Ali had shown that he was likely to suffer. But, as we explained in connection with Ali's challenge to the BIA's "other private actors"-related ruling, the IJ did not make that finding either. And, in any event, as we have noted, that is a strained reading of the BIA's opinion, given that the opinion expressly quotes only from the portion of the relevant regulations that purports to define how severe abuse must be to constitute torture, see 8 C.F.R. § 1208.18(a)(2) ("Torture is an extreme form of cruel and inhuman treatment . . . ."), rather than a regulation concerning how "likely" it must be that the noncitizen will be subjected to abuse that is severe enough to constitute torture, see, e.g., id. §§ 1208.16(c)(2), (4).[11]

Finally, the government contends that we still must affirm the BIA's ruling because, although Harper described violence, "she did not describe the injuries to the Somalis she

_____

[11] To the extent that the government means to argue here, too, that the BIA itself considered the Harper evidence in question because of the portion of the BIA's opinion in which the BIA states, "after considering the risk of torture from all sources in the aggregate," we cannot agree. That statement concerns only what the BIA determined that the IJ considered in making the finding about the severity of the abuse that Ali would face that the BIA attributed to the IJ. But, as we have explained, the IJ made no such finding.

witnessed being beaten or kicked . . . such that the agency could reasonably conclude she provided insufficient detail to show that such abuse by Somali security forces rose to the level of torture or that Ali was at risk that it likely would rise to the level of torture."  But, the IJ did not find that Ali had failed to meet his burden to show that he would likely be tortured by security forces in Somalia on any such basis.  Rather, the IJ rejected his "security forces"-related ground for requesting deferral of removal pursuant to the CAT solely because the IJ found that "Harper indicated that the main motivation" of the security forces who "mean to do the respondent harm" is "they are either too busy to protect themselves and therefore they cannot protect other people"  or to "harass people based on cultural differences," such that they would not be acting "with the consent or acquiescence of a public official or other person acting in an official capacity" in visiting any abuse on Ali.

Thus, the critical question is not whether substantial evidence could support a finding that Ali had failed to meet his burden to show that he would be subject to abuse by those forces severe enough to constitute torture.  See DeCarvalho, 18 F.4th at 73.  The critical question is whether this record compels the conclusion that Ali could not make the requisite showing with regard to the nature of the abuse to which he will be subjected, notwithstanding the IJ's failure to have addressed evidence

bearing on it.  See Un, 415 F.3d at 209.  Not even the government, however, argues that the record would compel such a finding.  Nor, we should add, does the government contend that the record compels the motivation-based finding that the IJ made with respect to Ali's claim of torture at the hands of the security forces of the government of Somalia.  Thus, we conclude that the prudent course is to vacate and remand for the BIA to address the aspects of the record that have not been given their proper consideration.  See id. at 210 ("[A]ssessing the credibility and significance of the evidence in the context of the entire record is a task for the IJ in the first instance.").

### III.

We therefore **grant** the petition for review, **vacate** the order of the BIA, and **remand** the case to the BIA for further proceedings consistent with this opinion.