# United States Court of Appeals
## For the First Circuit

No. 18-1861

FLEMI BARNODIS RODRÍGUEZ-VILLAR,

Petitioner,

v.

WILLIAM P. BARR,
Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Howard, <u>Chief Judge</u>,
Torruella and Selya, <u>Circuit Judges</u>.

Kevin MacMurray and MacMurray & Associates on brief for petitioner.

Joseph H. Hunt, Assistant Attorney General, Civil Division, U.S. Department of Justice, Jessica E. Burns, Senior Litigation Counsel, Office of Immigration Litigation, and John F. Stanton, Trial Attorney, Office of Immigration Litigation, on brief for respondent.

July 11, 2019

**SELYA**, <u>**Circuit Judge**</u>.  It is bad enough when acts in the nature of persecution are employed to chill the free expression of political opinion.  It exacerbates the problem though, when a reviewing tribunal turns such acts upside down and heralds their chilling effect as "proof" that no likelihood of persecution exists.  Because the agency's decision in this case rests upon just such an error, we grant the petition for judicial review, vacate the decision below, and remand for further proceedings.

The petitioner, Flemi Barnodis Rodríguez-Villar, is a Dominican national.[1]  The immigration judge (IJ) found him credible, so we draw the background facts largely from his testimony.

The petitioner entered the United States, without documentation, in 2003.  In 2011, he returned to the Dominican Republic to care for his ailing father.  Around May of that year, he opened a supermarket and soon began hosting meetings of the Dominican Revolutionary Party (PRD) at his store.  In short order, he began receiving telephone calls from members of the opposition party — the Dominican Liberation Party (PLD) — which at that time controlled the government.  The callers warned him that if he

---

[1]  The record reflects inconsistent spellings of the petitioner's name.  For simplicity's sake, we use the spelling employed by the Board of Immigration Appeals.

continued to host PRD meetings at his store, he and his family would be harmed.

The petitioner did not yield. A few weeks later, his home was ransacked and messages were written on the walls threatening him and his family with harm unless he stopped hosting PRD meetings. The petitioner reported this incident to the police, who told him that they would investigate in exchange for money and liquor from his store. Even though the petitioner complied, the police did nothing. The meetings continued and so did the mistreatment. The petitioner moved his family into a new home in a different neighborhood. Soon thereafter, that house was broken into, many of his appliances were stolen, and another threat of violence was scrawled on a wall.

Matters came to a head several months later. As the petitioner was closing his store for the day, he was set upon and beaten by two men. His attackers admonished that if he did not stop hosting PRD meetings, he "knew what was going to happen." The men added that he should "get ready because of what they were going to do to [his] family."

Fearing for his family's safety, the petitioner sent his wife and daughter to the United States. He remained in the Dominican Republic but stopped hosting the PRD meetings and "had to abandon [his] business" because "[i]t was no longer safe to be

there."  Once he cut those ties with the PRD, he experienced no further threats or violence.

In November of 2012, the petitioner traveled to the United States to rejoin his family.  He entered the United States without documentation and surrendered himself to Border Patrol agents in Texas, explaining that he feared he would be persecuted if he returned to the Dominican Republic.  After an interview, an asylum officer determined that the petitioner had a credible fear of harm in his homeland.  The petitioner was paroled into the United States.  The Department of Homeland Security proceeded to institute removal proceedings against him, charging him as removable under 8 U.S.C. § 1182(a)(7)(A)(i)(I).  The petitioner countered by filing cross-applications for withholding of removal and protection under the United Nations Convention Against Torture (CAT).[2]

When the petitioner's case came on for hearing before the IJ, he conceded removability.  After taking testimony, the IJ denied the petitioner's applications for relief and ordered his removal.  The petitioner repaired to the Board of Immigration

---

[2] Although the petitioner initially indicated an intention to apply for asylum, he did not press such a claim, presumably because his initial arrival in the United States (in 2003) placed him well outside the one-year window for such an application.  See 8 U.S.C. § 1158(a)(2)(B) (providing that asylum application must be "filed within 1 year after the date of the alien's arrival in the United States").

Appeals (BIA), which affirmed the IJ's decision.  This timely petition for judicial review followed.

In the immigration context, judicial review typically focuses on the final decision of the BIA.  See Murillo-Robles v. Lynch, 839 F.3d 88, 91 (1st Cir. 2016).  But where "the BIA merely adds its gloss to the IJ's findings and conclusions, we treat the two decisions as one."  Id.  This is such a case.

Our standard of review is familiar.  We will uphold findings of fact in removal proceedings "as long as they are supported by substantial evidence on the record as a whole."  Pulisir v. Mukasey, 524 F.3d 302, 307 (1st Cir. 2008).  Put another way, we will leave the agency's findings of fact intact "unless the record is such as to compel a reasonable factfinder to reach a contrary determination."  Id.  Legal conclusions, though, engender de novo review, "with some deference to the agency's reasonable interpretation of statutes and regulations that fall within its purview."  Id.

With this standard in place, we turn to the particulars of the case at hand.  We start with the petitioner's claim for withholding of removal.  To prevail on such a claim, an alien bears the burden of demonstrating a clear probability that his life or freedom would be threatened in his homeland on account of race, religion, nationality, membership in a particular social group, or political opinion.  See Arévalo-Girón v. Holder, 667 F.3d 79, 82

(1st Cir. 2012) (citing 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b)). This task can be accomplished in one of two ways: an alien can demonstrate either that he has suffered past persecution, thus giving rise to a rebuttable presumption of future persecution, or he can demonstrate an independent likelihood of future persecution should he be returned to his homeland. See id. As it applies in immigration cases, "persecution" is a term of art. "To qualify as persecution, a person's experience must rise above unpleasantness, harassment, and even basic suffering." Rebenko v. Holder, 693 F.3d 87, 92 (1st Cir. 2012) (quoting Nelson v. I.N.S., 232 F.3d 258, 263 (1st Cir. 2000)). And in all events, the alien must establish a nexus between the described harm and one of the five statutorily protected grounds. See Arévalo-Girón, 667 F.3d at 82.

Here, the government does not dispute that the petitioner was mistreated on account of a statutorily protected ground: his pro-PRD political opinion. We thus train the lens of our inquiry on whether the petitioner established either that the mistreatment he endured was sufficiently severe as to constitute past persecution (entitling him to a rebuttable presumption of future persecution) or an independent likelihood of future persecution.

Even though the agency — a term that we use as a shorthand to cover both the BIA and the IJ, collectively — deemed

the petitioner credible, it nonetheless found that he failed to establish past persecution because the harm complained of (two threatening telephone calls, home invasions, and a beating, all of which occurred over a span of approximately nineteen months) did not rise above the level of harassment, unpleasantness, and basic suffering. The agency went on to find that the petitioner had not established an independent likelihood of future persecution, noting that he had remained in the Dominican Republic for a significant period after he was attacked without incurring any further threats or experiencing any further harm. The agency made no finding regarding whether the imprecations directed at the petitioner constituted credible death threats.

We turn first to the agency's finding concerning past persecution. To establish past persecution, an alien ordinarily must demonstrate "something like a pattern or prolonged period of events." Khan v. Mukasey, 549 F.3d 573, 577 (1st Cir. 2008); see Journal v. Keisler, 507 F.3d 9, 12 (1st Cir. 2007) ("In determining whether alleged incidents rise to the level of persecution, one important factor is whether 'the mistreatment can be said to be systematic rather than reflective of a series of isolated incidents.'" (quoting Bocova v. Gonzales, 412 F.3d 257, 263 (1st Cir. 2005))). When concluding here that the threatening calls, home invasions, scrawled warnings, and climatic beating did not

- 7 -

rise to the level of persecution, the agency overlooked several significant facts.

The record makes manifest that there were at least five incidents, increasing in severity from telephone calls to home invasions to physical violence accompanied by threats of future harm to the petitioner and his family. This escalating series of events ended abruptly as soon as the petitioner stopped hosting the PRD meetings. It is not at all apparent to us why these threats and violent acts — which seem to have ceased only because the petitioner gave into the PLD's demands — do not comprise a pattern sufficient to show past persecution. The agency "may well have had valid reasons for its [contrary] conclusion, but if so those reasons have not been articulated 'with sufficient particularity and clarity.'" Halo v. Gonzales, 419 F.3d 15, 19 (1st Cir. 2005) (citation omitted) (quoting Gailius v. I.N.S., 147 F.3d 34, 46 (1st Cir. 1998)); see Sulaiman v. Gonzales, 429 F.3d 347, 350 (1st Cir. 2005) (explaining that "[a]n IJ is obligated to offer more explanation when the record suggests strong arguments for the petitioner that the IJ has not considered").

What is more, the agency failed to assess whether the final threat — that the petitioner "knew what was going to happen . . . to [his] family" — constituted a credible death threat.[3]

---

[3] In its brief, the government does not dispute that these menacing words constituted a death threat. It argues instead that

- 8 -

This is important because credible death threats, in and of themselves, may constitute compelling evidence of persecution. See, e.g., Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007); Un v. Gonzáles, 415 F.3d 205, 210 (1st Cir. 2005).

Although the agency is not required to discuss every piece of evidence, it must, at a minimum, "fairly appraise the record" and "cannot turn a blind eye to salient facts." Sihotang v. Sessions, 900 F.3d 46, 51 (1st Cir. 2018). Because the agency failed to grapple with the grave nature of the threats and appears to have placed the length of time that the petitioner was under the compulsion of his persecutors in the wrong pan of the scale, we conclude that the agency's "reasoning is inadequate to support a finding of no past persecution." Mihaylov v. Ashcroft, 379 F.3d 15, 23 (1st Cir. 2004).

This brings us to the agency's analysis of whether the petitioner established an independent likelihood of future persecution. We have held before that the agency cannot simply sweep material evidence under the rug but, rather, must consider such evidence and factor it into the decisional calculus. See, e.g., Sok v. Mukasey, 526 F.3d 48, 54-55 (1st Cir. 2008); Mihaylov, 379 F.3d at 22; Gailius, 147 F.3d at 46-47. Overlooking material

---

"[b]ecause the threats to Petitioner were not imminent and his assailants did not attempt to carry them out, they do not constitute persecution." The government's attempt to confess and avoid highlights the need for an agency finding.

- 9 -

evidence is normally a sin of omission. Here, however, the agency was guilty of something worse: it did not simply ignore the fact that the petitioner's political activity was chilled; instead, it used that evidence against the petitioner, finding that the period of time during which there were no threats negated any likelihood of future persecution. This reasoning stands logic on its head. That an alien can escape harm by ceasing to express his political opinion tends to prove the efficacy of the persecution, not to disprove the alien's fear of persecution on account of his political opinion. Cf. Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1354 (11th Cir. 2009) (concluding that "having to practice religion underground to avoid punishment is itself a form of persecution"); Muhur v. Ashcroft, 355 F.3d 958, 960-61 (7th Cir. 2004) (finding "clear error of law" in assumption "that one is not entitled to claim . . . religious persecution if . . . one can escape the notice of the persecutors by concealing one's religion"). Indeed, the very fact that threats impel an alien to soft-pedal his political opinions is quite likely an indication that his fear of persecution is real.

Viewing the situation from another angle confirms this intuition. A principal goal of persecuting the expression of political opinion is to silence those who cleave to it in the hope that their political views will not gain traction. Cf. Muhur, 355 F.3d at 961 (noting that "[o]ne aim of persecuting a religion is

- 10 -

to drive its adherents underground").  So here:  the purpose of the PLD's threats and violence was to coerce the petitioner to stop hosting PRD meetings.  That the threats and violence sent a convincing enough message to frighten the petitioner into complying is evidence in support of his claim, not evidence against it.  The agency's contrary reasoning would lead to the bizarre result that persons who experienced threats that were sufficiently credible to cause them to cease expressing their political opinion would not be eligible for immigration relief.  Cf. Cordero-Trejo v. I.N.S., 40 F.3d 482, 489 (1st Cir. 1994) (concluding that "to infer that an asylum applicant is unlikely to be persecuted because he and his relatives were not killed during attempts to terrorize them 'lead[s] to the absurd result of denying asylum to those who have actually experienced persecution and were fortunate enough to survive'" (alteration in original) (quoting Del Valle v. I.N.S., 776 F.2d 1407, 1413 (9th Cir. 1985))).

Despite the disingenuous nature of the agency's reasoning, the government attempts to defend it.  Its brief cites several cases in which courts have upheld denials of immigration relief under what the government claims are "comparable circumstances."  But the government reads those cases through rose-colored glasses.  None of the cases that it cites involves circumstances in which an alien ceased to engage in statutorily protected activity due to the prospect of further threats or

- 11 -

violence.  See, e.g., Stepanyan v. Holder, 580 F. App'x 588, 590 (9th Cir. 2014) (denying application for relief based on alien's husband's political activity where husband had left country and alien herself was not politically active); Morina v. Att'y Gen. of U.S., 427 F. App'x 145, 149 (3d Cir. 2011) (per curiam) (denying application for relief because political landscape had changed materially since aliens' departure); Myint Oo Lwin v. Gonzales, 220 F. App'x 36, 39 (2d Cir. 2007) (finding alien's "1988 political activities [not] relevant to his 2004 asylum claim" because he "no longer asserts a fear of persecution due to his political activities or opinion").

To say more about the agency's resolution of the petitioner's application for withholding of removal would be to paint the lily.  We conclude that the agency committed legal error both in overlooking critical evidence supporting the petitioner's claim for withholding of removal and in using such evidence as part of its rationale for denying that claim.  While Rumpelstiltskin is said to have converted dross into gold, the agency cannot convert evidence favorable to an alien into evidence unfavorable to the alien simply by ignoring the context of such evidence.

This leaves the agency's denial of the petitioner's application for protection under the CAT.  To be eligible for CAT protection, "an alien must show that it is more likely than not

that he will be tortured if returned to his homeland." Jiang v. Gonzales, 474 F.3d 25, 32 (1st Cir. 2007); see Efe v. Ashcroft, 293 F.3d 899, 907 (5th Cir. 2002) (explaining that CAT protection is not triggered by persecution but, rather, must meet the higher bar of torture). For this purpose, "[t]orture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). Torture does not, however, "include lesser forms of cruel, inhuman or degrading treatment or punishment." Id. § 208.18(a)(2).

Here, the agency made a conclusory finding that the petitioner had not adduced enough evidence to show a likelihood that he would be subjected to torture at the hands of, or with the acquiescence of, the Dominican government. Yet once again, the agency failed to offer a reasoned explanation for its conclusion. Consequently, we are unable to determine whether the flaws that permeated the agency's analysis of the petitioner's withholding of removal claim also compromised its barebones analysis of his CAT claim. In particular, it is not clear to us whether the agency improperly considered the period of time during which the petitioner's political activity was chilled as evidence against his claim that he would likely be tortured.

- 13 -

We need go no further.  For the reasons elucidated above, we grant the petition for judicial review, vacate the agency's final order in its entirety, and remand for further proceedings consistent with this opinion.  See, e.g., Enwonwu v. Gonzales, 438 F.3d 22, 35 (1st Cir. 2006) (remanding for further consideration of CAT claim where agency's opinion was "insufficiently reasoned"); Gailius, 147 F.3d at 47 (explaining that remand is appropriate when agency's decision rests on flawed reasoning).  The stay of removal previously entered shall remain in effect pending further order of this court; and we retain jurisdiction to the extent necessary to extend, modify, dissolve, or ensure compliance with that stay.

**So ordered.**