# United States Court of Appeals
## For the First Circuit

No. 20-1912

RICARDO JOSE PINEDA-MALDONADO,

Petitioner,

v.

MERRICK B. GARLAND,
Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Chief Judge,
Howard and Gelpí, Circuit Judges.

Kimberly A. Williams, with whom Jeffrey B. Rubin, Todd C. Pomerleau, and Rubin Pomerleau PC were on brief, for petitioner.

Yanal H. Yousef, Trial Attorney, Office of Immigration Litigation, with whom Brain M. Boynton, Acting Assistant Attorney General, Civil Division, Anthony P. Nicastro, Assistant Director, Office of Immigration Litigation, and Sherease Pratt, Senior Litigation Counsel, Office of Immigration Litigation, were on brief, for respondent.

January 24, 2024

**BARRON**, **Chief Judge**.  Ricardo Jose Pineda-Maldonado ("Pineda-Maldonado") is a native and citizen of El Salvador.  He petitions for review of the decision by the Board of Immigration Appeals ("BIA") that denied his application for asylum and claims for withholding of removal and protection under the Convention Against Torture ("CAT").  We grant the petition, vacate the BIA's decision, and remand for further proceedings consistent with this decision.

**I.**

After fleeing El Salvador, Pineda-Maldonado entered the United States without inspection on or about April 29, 2016.  He was charged with removal in July of 2016.  He then applied for asylum and brought claims for withholding of removal and protection under the CAT.[1]  During his removal proceedings, Pineda-Maldonado put forth the following evidence through a declaration and testimony.

In August of 2014, Pineda-Maldonado's father, Victor Manuel Pineda-Benitez, was murdered in El Salvador by "cattle thieves" to whom the father owed a gambling-related financial debt. More than a year later, in early February of 2016, Pineda-Maldonado

---

[1]  Pineda-Maldonado also moved to terminate his agency proceedings based on the Supreme Court's holding in Pereira v. Sessions, 138 S. Ct. 2105 (2018).  Both the Immigration Judge ("IJ") and the BIA denied his motion, and he does not contest the agency's denial on appeal.

"began receiving telephone calls" from the cattle thieves in which they threatened to kill both Pineda-Maldonado and his brother unless the father's gambling debt was paid. The cattle thieves also made these death threats out of a concern that Pineda-Maldonado and his brother would take "reprisals" against them for their having murdered his father.

Later in February of 2016, the cattle thieves approached Pineda-Maldonado on the street and questioned him about his father's debt. They beat Pineda-Maldonado during the encounter and threatened to take his life unless he paid the debt. Pineda-Maldonado attempted to file a police report about the incident, but the police refused to file the report or even to investigate.

Soon thereafter, as Pineda-Maldonado was leaving a soccer game, police officers detained him, searched his belongings, physically beat him, and, while doing so, asked him if he was Victor's son. When Pineda-Maldonado answered that he was, the police officers beat him more forcefully.

Following the beating, Pineda-Maldonado saw members of the local police meeting with the cattle thieves. Not long after, Pineda-Maldonado fled El Salvador and entered the United States without inspection.

The "IJ" assigned to the removal proceedings deemed Pineda-Maldonado credible but rejected his application for asylum, denied both his withholding of removal and CAT claims, and entered

a final order of removal against him.  Pineda-Maldonado appealed the IJ's decision to the BIA, which affirmed "for the reasons articulated in [the IJ's] decision" while "emphasiz[ing]" certain findings that the IJ had made.  Pineda-Maldonado then filed this timely petition for review.

## II.

"Where, as here, the BIA 'adopts and affirms the IJ's ruling' but nevertheless 'examines some of the IJ's conclusions,' we review both the BIA and IJ opinions as a unit," Gómez-Medina v. Barr, 975 F.3d 27, 31 (1st Cir. 2020) (quoting Perlera-Sola v. Holder, 699 F.3d 572, 576 (1st Cir. 2012)), referring to the IJ and BIA together as the "agency."  In conducting our review, we defer to the agency's factual determinations "as long as those determinations are supported by substantial evidence," but we review questions of law de novo.  Ahmed v. Holder, 611 F.3d 90, 94 (1st Cir. 2010).

## III.

We start with Pineda-Maldonado's challenge to the denial of his CAT claim.  To succeed on his request for protection under the CAT, Pineda-Maldonado must show that "it is more likely than not that he will be tortured if returned to his home country." Bonnet v. Garland, 20 F.4th 80, 84 (1st Cir. 2021) (quoting Mazariegos v. Lynch, 790 F.3d 280, 287 (1st Cir. 2015)).

- 4 -

Under the CAT, torture involves, among other things, "an act causing severe physical or mental pain or suffering . . . by or at the instigation of or with the consent or acquiescence of a public official." Romilus v. Ashcroft, 385 F.3d 1, 8 (1st Cir. 2004) (quoting Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004)); see 8 C.F.R. § 208.18(a)(1). "[M]ental pain or suffering . . . caused by or resulting from" threats of "imminent death" constitutes "torture." 8 C.F.R. § 208.18(a)(4); Ali v. Garland, 33 F.4th 47, 53-54 (1st Cir. 2022). Evidence of past torture "is relevant to the question of whether [an individual] is more likely than not to face future torture." Hernandez-Martinez v. Garland, 59 F.4th 33, 40 (1st Cir. 2023); see 8 C.F.R. § 208.16(c)(3).

We begin with Pineda-Maldonado's challenge to the agency's finding that he had not been tortured in the past. He contends that finding cannot be sustained because neither the IJ nor the BIA addressed the features of the evidence in the record that bear most directly on that finding. Reviewing for whether the agency's factual findings of no torture are supported by substantial evidence on the record as a whole, Rodríguez-Villar v. Barr, 930 F.3d 24, 27 (1st Cir. 2019), we agree that the finding cannot be sustained.

The IJ did refer to the record evidence that supportably shows that the cattle thieves had "threatened" Pineda-Maldonado. The IJ also referred to the record evidence that the cattle thieves

- 5 -

had encountered Pineda-Maldonado on the street in February of 2016 and told him that he "had to leave" El Salvador if he did not pay the debt in question.  In addition, the IJ noted that the cattle thieves had physically assaulted Pineda-Maldonado during that same encounter with him.  But, while not all threats may cause torture threats of imminent death may.  See Lobo v. Holder, 684 F.3d 11, 20 (1st Cir. 2012).  Yet, the IJ failed to assess -- at least in any express way -- whether the cattle thieves' death threats were threats of imminent death.  Indeed, the IJ did not refer to the threats as being death threats at all.

Of course, there is no requirement that a finding that a death threat was not a threat of imminent death be express.  Cf. Pulisir v. Mukasey, 524 F.3d 302, 308 (1st Cir. 2008) (acknowledging that an IJ may make implicit subsidiary findings of fact); Rotinsulu v. Mukasey, 515 F.3d 68, 72 (1st Cir. 2008) (same).  But we cannot infer that the IJ based her no-past-torture finding on an implicit finding that the threats were not of imminent death.  The IJ neither referred to the threats as death threats nor mentioned the features of the record that supportably (even if not conclusively) show that the threats did involve threats of that sort -- namely, the evidence that the cattle thieves had threatened to kill Pineda-Maldonado repeatedly within a short period of time, culminating in their threat to do so while

they were both beating him and telling him that he better leave the country if he was not going to pay off the debt.

Moreover, even if we were to assume that the IJ had made an implicit finding that the cattle thieves' threats did not amount to torture because they were not threats of imminent death, the IJ still "fail[ed] to articulate [her] reasoning on this issue with sufficient particularity and clarity" to permit us to "infer the factual or legal basis for [that] determination." H.H. v. Garland, 52 F.4th 8, 23 (1st Cir. 2022) (internal quotations omitted). Accordingly, we cannot sustain the agency's decision denying the CAT claim on the ground that Pineda-Maldonado failed to show that he had been subject to torture in the past. See 8 C.F.R. § 208.18(a)(4)(iii); Rodríguez-Villar, 930 F.3d at 28 (vacating findings of no past torture and no past persecution where the agency "failed to assess" whether the threats directed at the applicant were death threats and thus "turn[ed] a blind eye to salient facts" by "fail[ing] to grapple with the grave nature of th[ose] threats" (quoting Sihotang v. Sessions, 900 F.3d 46, 51 (1st Cir. 2018))).

The IJ did separately conclude that "[t]here is insufficient evidence that [Pineda-Maldonado] would be tortured in the future" if he were removed to El Salvador. But, as we have explained above, evidence of past torture is relevant to a determination of whether there is a basis for finding that a person

- 7 -

seeking CAT protection has met the burden to show a likelihood of being subjected to torture in the future. See 8 C.F.R. § 208.16(c)(3)(i) (directing that evidence relevant to the possibility of future torture includes "[e]vidence of past torture"); Hernandez-Martinez, 59 F.4th at 40; see also Romilus, 385 F.3d at 9 (analyzing past incidents in determining likelihood of future torture). Thus, our reasons for concluding that the IJ's no-past-torture finding cannot be sustained also preclude us from concluding that the IJ's no-future-torture finding can be sustained. See Ali, 33 F.4th at 56, 60.

There does remain the BIA's decision that affirms the IJ's denial of Pineda-Maldonado's CAT claim. But the BIA purported to be relying only on "the reasons articulated in [the IJ's] decision." Thus, that ruling provides no independent basis for our concluding that the agency adequately explained the decision to deny Pineda-Maldonado's CAT claim. See Ordonez-Quino v. Holder, 760 F.3d 80, 87-90 (1st Cir. 2014) (granting a petition for review where the BIA adopted and affirmed the IJ's decision that "ignored or unreasonably interpreted crucial . . . evidence" and provided no further reasons for the denial on that basis); see also Cabrera Vasquez v. Barr, 919 F.3d 218, 224 n.3 (4th Cir. 2019) ("The agency did not consider whether the death threats [against petitioner] constituted torture under the CAT. . . . Upon remand, therefore, we expect that if there is a finding that the threats [the

- 8 -

petitioner] received do not amount to torture, it will be accompanied by meaningful reasoning."). Accordingly, we grant the petition as to the CAT claim, vacate the agency's order denying it, and remand for proceedings consistent with this opinion.[2]

## IV.

We turn, then, to the portions of the petition for review that challenge the agency's denial of Pineda-Maldonado's application for asylum and its rejection of his claim for withholding of removal. Here, too, we conclude that there is merit to the petition.

---

[2] We see no basis for concluding that the agency's errors in failing to address critical evidence were harmless, nor does the Attorney General contend that they were. We note, too, that the Attorney General -- understandably -- makes no argument that the IJ's statement that Pineda-Maldonado "ha[d] not established that it is more likely than not that officials in El Salvador would consent, acquiesce, turn a blind eye or actively engage in the torture of the respondent" amounts to a determination that Pineda-Maldonado failed to show that, even if he had established that the mistreatment that he would likely face in El Salvador if he returned to that country would rise to the level of torture, he failed to show that officials in El Salvador would "consent, acquiesce, turn a blind eye or actively engage" in it. See H.H., 52 F.4th at 17, 19-20 (explaining that "a government's 'acquiescence' to torture for purposes of the CAT may include a showing of willful blindness," which involves showing a "likelihood of a foreign government's awareness of torture" as well as "a likely breach of the government's duty to intervene to prevent the torture"); cf. Perez-Trujillo v. Garland, 3 F.4th 10, 19-20 (1st Cir. 2021).

**A.**

To be eligible for asylum, see 8 U.S.C. § 1158(b)(1)(A), an applicant must show that he or she is "unable or unwilling to avail himself or herself of the protection of[] [any country of his or her nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42)(A). Asylum is "proper in mixed-motive cases even where one motive would not be the basis for asylum, so long as one of the statutory protected grounds is 'at least one central reason' for the persecution." Aldana-Ramos v. Holder, 757 F.3d 9, 18 (1st Cir. 2014) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

We have explained that an asylum applicant's showing that he has suffered past persecution "creates a rebuttable presumption of a well-founded fear of future persecution." Paiz-Morales v. Lynch, 795 F.3d 238, 243 (1st Cir. 2015) (quoting Singh v. Holder, 750 F.3d 84, 86 (1st Cir. 2014)). We have also held that "credible death threats" can "amount to past persecution." Aguilar-Escoto v. Garland, 59 F.4th 510, 516 (1st Cir. 2023); see Javed v. Holder, 715 F.3d 391, 395-96 (1st Cir. 2013). We have made clear as well that "the addition of physical violence, although not required, makes a threat more likely to constitute persecution." Javed, 715 F.3d at 396.

To be eligible for withholding of removal, a claimant must demonstrate "a clear probability that, if returned to his homeland, he will be persecuted on account of a statutorily protected ground." Sanchez-Vasquez v. Garland, 994 F.3d 40, 46 (1st Cir. 2021). This "clear probability" standard "is even higher" than the asylum standard. Villalta-Martinez v. Sessions, 882 F.3d 20, 23 (1st Cir. 2018); see Barnica-Lopez v. Garland, 59 F.4th 520, 527-28 (1st Cir. 2023) ("'[W]ithholding of removal requires . . . a clear probability of persecution, rather than merely [the] well-founded fear of persecution' required for asylum, and subjective fear is only relevant for the latter." (second alteration in original) (quoting Sanchez-Vasquez, 994 F.3d at 46)). In the case of withholding of removal, as in the case of asylum, evidence of past persecution creates a rebuttable presumption of future persecution. Rotinsulu, 515 F.3d at 72 (citing 8 C.F.R. § 1208.16(b)(1)).

**B.**

The agency's denial of Pineda-Maldonado's application for asylum rested on two grounds. The first was Pineda-Maldonado's asserted failure to show either (1) that the mistreatment that he had shown that he had been subjected to in the past rose "to the level" of persecution or (2) that he had a well-founded fear of being subjected to mistreatment that would rise to that level in the future. The second was that he had failed to show the requisite

- 11 -

nexus between the mistreatment that grounded his application for asylum and a protected status. Pineda-Maldonado contends that neither ground holds up. We agree.

**1.**

As to the first ground, the IJ found both that Pineda-Maldonado failed to show that the cattle thieves' mistreatment of him in El Salvador rose to the level of persecution and that he failed to show that he otherwise had a well-founded fear of persecution. But Pineda-Maldonado's arguments that neither finding can be sustained persuade us.

The IJ's finding that the cattle thieves' mistreatment did not rise to the level of persecution is one of fact that we must uphold so long as it is supported by substantial evidence. See Ahmed, 611 F.3d at 94. But just as threats of death may cause torture when they are threats of imminent death, see Ali, 33 F.4th at 53-54, threats of death constitute persecution when they are threats of that unusual kind, see, e.g., Aguilar-Escoto, 59 F.4th at 516; Javed, 715 F.3d at 395-96; Amouri v. Holder, 572 F.3d 29, 33 (1st Cir. 2009). Yet, the IJ based her finding that the cattle thieves' mistreatment did not rise to the level of persecution on the same stripped-down description of that mistreatment that we have concluded fails to suffice to explain the agency's determination that Pineda-Maldonado had not been tortured in the past. Thus, we may not sustain that finding any more than we may

- 12 -

sustain the IJ's no-past-torture finding.  See Rodríguez-Villar, 930 F.3d at 27-28 (vacating a finding of no past persecution for an applicant who suffered two threatening phone calls, two home invasions, and a beating over the course of approximately nineteen months where the agency "failed to grapple with the grave nature of the [death] threats"); Un v. Gonzales, 415 F.3d 205, 207, 209-10 (1st Cir. 2005) (granting a petition for review and remanding for the agency to consider whether two confrontations over the course of four months, one of which included death threats, constituted past persecution); Aguilar-Escoto, 59 F.4th at 516-17 (finding reversible error where the agency failed to analyze "or, indeed, mention . . . whether the death threats [the applicant] experienced coupled with physical violence rose to the level of persecution").

The Attorney General does point out that "mistreatment ordinarily must entail more than sporadic abuse in order to constitute persecution[,]" Bocova v. Gonzalez, 412 F.3d 257, 263 (1st Cir. 2005), superseded in unrelated part by 8 C.F.R. § 1240.26(i), as recognized in Ivanov v. Holder, 736 F.3d 5, 20 (1st Cir. 2013).[3]  And the IJ did find that the beating that Pineda-Maldonado received from the cattle thieves and the beating that he

---

[3] We have acknowledged, however, that "a death threat in the midst of a single act of violence" may be "enough to establish past persecution."  Thapaliya v. Holder, 750 F.3d 56, 60 (1st Cir. 2014).

- 13 -

received from the police were two separate incidents that occurred over the course of two different months.

But even if we were to set aside the beating that Pineda-Maldonado endured at the hands of the police officers on the ground that it was an incident that was isolated from the cattle thieves' mistreatment, there would remain the question of whether the cattle thieves' mistreatment in and of itself rose to the level of persecution. The IJ made no finding, however, that the cattle thieves' mistreatment of Pineda-Maldonado merely consisted of a series of isolated incidents, none of which rose to the level of persecution. Nor does the Attorney General argue that the record could support any such finding. And, we note, the record supportably shows that, within the same month, the cattle thieves not only lodged death threats against Pineda-Maldonado, both by phone and in person, but also that, in making them, the cattle thieves consistently focused their attention on both his father and his father's debt. Thus, with no ruling by the agency on this factual point, we see no basis for upholding the agency's denial of asylum, as we see no basis for concluding that the record compels the finding that the cattle thieves' mistreatment was not serious enough to qualify as persecution because that mistreatment consisted of only isolated incidents that were not in themselves serious enough to be so deemed.

- 14 -

Turning to the IJ's separate finding that Pineda-Maldonado had failed to meet his burden to show that he had a well-founded fear of future persecution should he return to El Salvador, we again confront a finding of fact. See Ahmed, 611 F.3d at 94. But this factual finding also provides no basis for our sustaining the agency's denial of his asylum application.

The IJ made this determination on the ground that Pineda-Maldonado's brother, who Pineda-Maldonado claimed was in hiding, lived in a different town and had not been subject to any further harm or threats. But, as we have said, a finding of past persecution triggers a presumption of future persecution. See Uruci v. Holder, 558 F.3d 14, 18-19 (1st Cir. 2009). And yet the IJ did not apply that presumption here, precisely because she found that there had been no showing of past persecution. Accordingly, we cannot sustain the agency's denial of the asylum application based on the finding that Pineda-Maldonado failed to meet his burden to show that he would be subject to future persecution. See Sok v. Mukasey, 526 F.3d 48, 56 (1st Cir. 2008); Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 22 (1st Cir. 2004) ("[T]he absence of reasoned discussion of past persecution undercuts any meaningful review of the [agency's] fear of future persecution finding, because we do not know whether [the applicant] should have had the benefit of the regulatory presumption of fear of persecution based on prior events." (second and third alterations

- 15 -

in original) (quoting El Moraghy v. Ashcroft, 331 F.3d 195, 204-05 (1st Cir. 2003))).

We add only that the fact that the BIA affirmed the IJ's denial of the asylum application also provides no basis for our sustaining the agency's denial of that application on the ground that Pineda-Maldonado had not met his burden to show either that the past mistreatment that he had endured rose to the level of persecution or that the mistreatment that he feared that he would endure in the future would rise to such level. And that is because the BIA provided no justification for affirming the IJ's denial of the asylum application beyond the reasons that the IJ gave for denying it.

## 2.

The agency did also provide an independent ground for its decision to deny Pineda-Maldonado's asylum application: he failed to show the required nexus between the persecution that grounds his asylum application and one of the five statutorily enumerated protected statuses. See 8 U.S.C. § 1101(a)(42)(A). The protected ground to which Pineda-Maldonado claims his persecution bears a nexus is family membership. See Aldana-Ramos, 757 F.3d at 15-16. But, we are persuaded by Pineda-Maldonado's arguments that this ground for denying his asylum application is also wanting.

- 16 -

We have confronted the question of when alleged persecution is "on account of" family status in a variety of contexts, see, e.g., Aldana-Ramos, 757 F.3d 9; Villalta-Martinez, 882 F.3d 20; Enamorado-Rodriguez v. Barr, 941 F.3d 589 (1st Cir. 2019); Giraldo-Pabon v. Lynch, 840 F.3d 21 (1st Cir. 2016); Aguilar-De Guillen v. Sessions, 902 F.3d 28 (1st Cir. 2018); Loja-Tene v. Barr, 975 F.3d 58 (1st Cir. 2020); Barnica-Lopez, 59 F.4th 520; Sosa-Perez v. Sessions, 884 F.3d 74 (1st Cir. 2018). But we have not been "entirely clear" about "when an asylum applicant is persecuted 'on account of' membership in a family unit." Marín-Portillo v. Lynch, 834 F.3d 99, 102 n.4 (1st Cir. 2016).

We have been clear that "[t]he mere fact that [a family] received threats as a family unit, without more, 'does not convert [a] non-protected criminal motivation into persecution on the basis of family connections.'" Barnica-Lopez, 59 F.4th at 531-32 (quoting Loja-Tene, 975 F.3d at 62). The more elusive question is the one that this case squarely implicates: what must that "more" entail?

We have explained that for persecution to have been "on account of" family membership the reason for the persecution "cannot be 'incidental, tangential, superficial, or subordinate to another reason for [the] harm.'" Sanchez-Vasquez, 994 F.3d at 47 (quoting Singh v. Mukasey, 543 F.3d 1, 5 (1st Cir. 2008)). Rather, "family membership . . . must be at the root of the persecution,

- 17 -

so that family membership itself brings about the persecutorial conduct." Barnica-Lopez, 59 F.4th at 530 (quoting Ruiz-Escobar v. Sessions, 881 F.3d 252, 259 (1st Cir. 2018)).

That does not mean, however, that such membership must have been the sole reason for the persecution. See Aldana-Ramos, 757 F.3d at 18. Family membership need only "qualify as [one] 'central reason' for the harm." Sanchez-Vasquez, 994 F.3d at 47.

Given this body of precedent, we do not disagree with the agency that, insofar as the record supportably shows in this case that the mistreatment at issue was solely driven by a "personal" dispute, there would be no basis for overturning the agency's nexus finding. As we have explained, "[e]vents that stem from personal disputes are generally not enough to show the required nexus," Barnica-Lopez, 59 F.4th at 531 (alteration in original) (quoting Sompotan v. Mukasey, 533 F.3d 63, 71 (1st Cir. 2008)), in cases in which an asylum applicant claims to have been subjected to persecutorial conduct on account of family status. And in line with that precedent, we have "long 'viewed disputes motivated by revenge as personal in nature,'" id. (quoting Marín-Portillo, 834 F.3d at 101), just as we have deemed disputes over money to be, see Villalta-Martinez, 882 F.3d at 23-24.

Nonetheless, in Marín-Portillo, 834 F.3d at 102, n.4, we were careful to acknowledge a potential concern with characterizing mistreatment alleged to be "on account of" family

- 18 -

status as merely stemming from a personal dispute. The concern was with construing the nexus requirement in a manner that would "effectively swallow[] the rule that family membership is a protected social group." Id. We acknowledged that this concern stemmed from the reality that victims of persecution "on account of" family status may be "regularly -- and perhaps invariably -- targeted, whether for retribution or otherwise, because of the actions of another member of their family." Id. Accordingly, our analysis in Marín-Portillo made clear the fact-dependent nature of the nexus inquiry in cases involving claims of persecution "on account of" family status.

With respect to that point, in Marín-Portillo we rejected on nexus grounds a claim of family-status-based persecution in which the petitioner claimed that he was being persecuted by the individual who had murdered the petitioner's father. And, in doing so, we focused our analysis on what the record revealed about whether the petitioner himself had taken any actions that led the alleged persecutor to either want vengeance against the petitioner or to fear that the petitioner would take revenge on him for his murder of the petitioner's father. See id. at 101-02. We also emphasized in so ruling that "[w]e d[id] not intend for [our] opinion to shed light on the question of whether petitioners may claim persecution on account of family membership

- 19 -

when they are targeted as retaliation for the actions of another family member."  Id. at 102 n.4 (emphasis added).

We do recognize that the agency here found that Pineda-Maldonado had failed to meet his burden to show that family membership was "one central reason" for the alleged persecution in this case.  See Aldana-Ramos, 757 F.3d at 18.  We recognize, too, that this determination is one of fact that we must sustain unless the record "compel[s] the contrary conclusion."  See Jimenez-Portillo v. Garland, 56 F.4th 162, 167 (1st Cir. 2022) (alteration in original) (quoting Lopez de Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir. 2007)).

Moreover, the record does plainly show that the cattle thieves were of the view that Pineda-Maldonado owed them his father's debt and that they were motivated to mistreat him by their desire to get him to pay that debt.  Thus, in that sense, there was clearly a pecuniary motive for the mistreatment.  We also note that there is no evidence that the cattle thieves had any invidious animus against Pineda-Maldonado's family unconnected to the debt.  So, in that respect as well, this is not a straightforward case of family-based persecution.

Nonetheless, there is no question on this record that the cattle thieves were targeting Pineda-Maldonado because they deemed him to be indebted to them.  Yet, there is nothing in the record that could explain why the cattle thieves deemed Pineda-

Maldonado to be indebted to them apart from their knowledge that he was a member of his father's family.

For example, nothing in the record indicates that Pineda-Maldonado in fact had acquired a legal obligation to pay his father's debt in consequence of his family status, such that the debt on that basis could fairly be understood to be Pineda-Maldonado's in his own right. See Rui Sheng Zhu v. Holder, 378 F. App'x 599, 600 (9th Cir. 2010) (noting that the families of debtors who owe money to the Chinese government themselves owe the debt under Chinese law); Yin Guan Lin v. Holder, 411 F. App'x. 901, 905 (7th Cir. 2011). Nor do we see how the cattle thieves' choice to target Pineda-Maldonado for the mistreatment could be deemed to stem from their determination that he had special access to the money that they sought, such that their motivation to target him for mistreatment could be deemed on that basis to stem from some attribute of his apart from his familial status as his father's son. See Villalta-Martinez, 882 F.3d at 23-25. Rather, from all that the record reveals, the cattle thieves deemed Pineda-Maldonado as having "owed" the debt solely due to the "actions of another family member" -- namely, those of his father in incurring the debt -- and his familial tie to that family member. Marín-Portillo, 834 F.3d at 102 n.4.

There also is nothing in any of our precedents that requires a different conclusion. Indeed, a comparison of the facts

here to those in our most analogous precedent, Ruiz-Varela v. Barr, 984 F.3d 122 (1st Cir. 2020), leads us to conclude that substantial evidence does not support the agency's no-nexus finding here.

Ruiz-Varela involved a claim of family-based persecution by a petitioner who was the son of a small-business owner who was being extorted for protection money. Id. at 124, 126-27. The petitioner contended that he was being targeted by his persecutors to exert pressure on the father to give in to the extortion. Id. at 127.

We explained that the record showed that, even if the father was the only one being extorted, (1) the petitioner was working alongside his father at the small business and was frequently there when the alleged persecutors came to demand the protection money, id. at 126-27; (2) other family members, who lived either nearby and frequented the small business or in a residence affixed to the backside of the building in which the business was located, were not themselves targeted for mistreatment, id. at 127; and (3) there was no indication in the one instance in which the alleged persecutors shot at the petitioner that they were motivated to do so because of his familial tie to his father, id. Thus, we concluded that the evidence did not compel the conclusion that the petitioner was mistreated on account of his family status to pressure his father because the evidence showed that the alleged persecutors had

available for targeting, but did not pursue, "other ready, familial targets" in their attempts to extort the father.  Id. at 127.

The record here is very different.  The only other living family member of whom the evidence supportably shows the cattle thieves were aware was Pineda-Maldonado's brother.  Cf. id. at 126 n.2 (finding it relevant that it could be easily inferred from the record that the alleged persecutors knew the petitioner's father had other nearby family members).  But the record supportably shows that Pineda-Maldonado's brother was himself the target of multiple death threats by the cattle thieves over the telephone during February of 2016.

The agency did determine that the fact that the brother was not thereafter targeted by the cattle thieves supported the conclusion that Pineda-Maldonado had failed to show that he had a well-founded fear of persecution on account of a protected ground. But there is no evidence in the record that Pineda-Maldonado's brother was proximate to the place where Pineda-Maldonado was beaten by the cattle thieves in the only instance in the record that shows them to have encountered Pineda-Maldonado face-to-face. Nor is there any evidence in the record of the brother being otherwise proximate to the cattle thieves during the relevant time and their choosing not to target him as they targeted Pineda-Maldonado when they encountered him.

Thus, in contrast to the situation in Ruiz-Varela, there is no record evidence here to show that the alleged persecutors chose not to target another family member even though that family member was available to be targeted. Finally, unlike the alleged persecutors in Ruiz-Varela, the cattle thieves during their beating of Pineda-Maldonado did in fact identify Pineda-Maldonado's father's debt as their motivation for the confrontation and ensuing assault. Accordingly, we do not see how we could say on this record that substantial evidence supports the finding that the family-based reason for targeting Pineda-Maldonado was "subordinate to" the pecuniary-based one, such that the family-based reason was not itself "at the root" of the alleged persecutorial conduct, see Barnica-Lopez, 59 F.4th at 530-31, and so "a central reason" for the mistreatment even if not the sole one, see Sanchez-Vasquez, 994 F.3d at 47 (internal quotations omitted).

We reach a similar conclusion with respect to whether Pineda-Maldonado has shown the claimed nexus to family status notwithstanding that the evidence shows that the cattle thieves were concerned that Pineda-Maldonado would seek retribution against them for having murdered his father. The fact that the cattle thieves were motivated in targeting Pineda-Maldonado in part to protect themselves, because they feared Pineda-Maldonado would retaliate against them, is not disputed by the parties. But

- 24 -

that fact does not in and of itself suffice to end the inquiry into whether family status was "a central reason" for their having targeted him, Aldana-Ramos, 757 F.3d at 18 (emphasis added), any more than the fact that the cattle thieves sought money in targeting Pineda-Maldonado due to his father's debt could end such an inquiry. The question remains as to whether there was any reason for the cattle thieves to fear that Pineda-Maldonado would retaliate against them apart from the mere fact that he was his father's son. Nothing in the record indicates, though, that Pineda-Maldonado had taken any actions or made any statements that could have led the cattle thieves to fear that he would harm them.

Thus, this case is not like Marín-Portillo, in which the record supportably showed that the perpetrator of the asserted persecution was aware that his target -- the petitioner -- was interested in holding the perpetrator accountable for his murder of the target's father and had already taken actions to do so. See 834 F.3d at 101-02. The record suffices instead to show here only that the sole basis for the alleged persecutors' fear of reprisals by Pineda-Maldonado was that they knew that he had a familial tie to the person whom they had murdered. So, here too, we conclude that, for all the record shows, family membership was "at the root" of the alleged persecutorial conduct, see Barnica-Lopez, 59 F.4th at 530.

In concluding that any persecution that Pineda-Maldonado suffered was "on account of" his family status, we emphasize that our reasoning accords with the Seventh Circuit's in Gonzalez Ruano v. Barr, 922 F.3d 346, 355-56 (7th Cir. 2019). There, the court held that an asylum applicant had shown persecution "on account of" his family status where the "relationship to his wife was the reason he, and not someone else, was targeted" by a persecutor who wanted to "possess" the applicant's wife. Id. And that was so, the court explained, because there was no action by the applicant apart from his having the familial tie that could explain the targeting. Id.

We note, too, that our decision accords with the Eleventh Circuit's conclusion in Perez-Sanchez v. U.S. Attorney General, 935 F.3d 1148 (11th Cir. 2019), that persecution was on account of family status where a cartel targeted an individual to pay back a debt said individual's father-in-law owed to the cartel. The court reasoned there that "it [was] impossible to disentangle" the applicant's family status from the cartel's pecuniary motives because "[a]bsent the familial relationship between [the asylum applicant] and [his father-in-law], the cartel would never have hunted [the applicant] . . . down." Id. at 1158. For the reasons we have given, here as well we find it "impossible to disentangle [Pineda-Maldonado's] relationship to his [father] from the [cattle

thieves'] pecuniary motives: they are two sides of the same coin."
Id.

We do recognize that some circuits appear to have held that animus toward a protected group must motivate the persecution for an applicant to be eligible for asylum. See, e.g., Orellana-Recinos v. Garland, 993 F.3d 851, 858 (10th Cir. 2021) (upholding an agency's conclusion that threatening a mother in an effort to recruit her son to join a gang did not constitute persecution on account of family membership because the agency could have reasonably found "that the gang members had no animus against [the petitioner's] family per se"); Cruz-Guzman v. Barr, 920 F.3d 1033, 1037-38 (6th Cir. 2019) (affirming the BIA's conclusion that the petitioner failed to show that the gang was "motivated by particular animus" toward the petitioner's family); Berrios-Bruno v. Garland, No. 18-60276, 2021 WL 3624766, at *5-6 (5th Cir. Aug. 16, 2021) (affirming the BIA's conclusion that the gang targeted the petitioner "only to effectuate its interests in maintaining a viable extortion regime" and not because of animus against the family to which the petitioner belonged). But, insofar as those circuits have, we cannot agree. The asylum statute does not say anything to suggest that "animus" toward a particular social group is required for an applicant to be eligible for asylum, as it uses the phrase "on account of." See 8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1101(a)(42)(A).

Nor does the Attorney General identify any binding agency precedent that sets forth a test other than the one that we apply here, which requires only that the petitioner show that a protected ground is "a central reason" for the persecution for the petitioner to show that the persecution was "on account of" that ground. Indeed, while the BIA has noted that a nexus "would be established based on family membership where a persecutor is seeking to harm the family members because of an animus against the family itself," Matter of L-E-A-, 27 I. & N. Dec. 40, 44 (BIA 2017), overruled on other grounds by Matter of L-E-A-, 27 I. & N. Dec. 581 (A.G. 2019) (emphasis added), the BIA determined there only that animus is a sufficient reason to find that persecution is on account of family membership, not that it is a necessary one, see id. at 45 ("However, if animus against the family per se is not implicated . . . . [t]here are other circumstances where the evidence establishes that one central reason for the applicant's harm was his or her family status.").[4]

---

[4] It is not entirely clear what the BIA and some of our sister circuits mean by "animus." But if "animus" is meant to refer to hatred of, or antagonism toward, the petitioner's family, we do not read any of our precedents in this realm that refer to "animus" to require a showing of such hatred or antagonism. Rather, all of them are compatible with the conclusion that a nexus to family status may be shown on the basis of evidence akin to the evidence that we conclude supportably shows such a nexus here. See Sanchez v. Garland, 74 F.4th 1, 6-7 (1st Cir. 2023); Perlera-Sola v. Holder, 699 F.3d 572, 576 (1st Cir. 2012); Barnica-Lopez, 59 F.4th at 532; Jimenez-Portillo, 56 F.4th at 168; Ruiz-Varela, 984 F.3d at 125; Gómez-Medina v. Barr, 975 F.3d 27, 31 (1st Cir. 2020).

Finally, we emphasize that in concluding that substantial evidence does not support the agency's finding that Pineda-Maldonado showed his family status only to have been "incidental" to both the cattle thieves' desire to obtain money from him and their fear of future retaliation by him, we do not thereby construe the nexus requirement to be any less demanding than it was intended to be. Rather, we construe it in a manner that accords with the notion that an asylum applicant must show that they have a well-founded fear of persecution that is based on "something that . . . is beyond the power of an individual to change," as such a showing "preserve[s] the concept that refuge is restricted to individuals who are . . . unable by their own actions . . . to avoid persecution." Matter of Acosta, 19 I. & N. Dec. 211, 233-34 (BIA 1985); see, e.g., Cece v. Holder, 733 F.3d 662, 669 (7th Cir. 2013) (recognizing deference to Acosta's formulation of particular social group as being "defined by a characteristic that is either immutable or is so fundamental to individual identity or conscience that a person ought not be required to change"); Diaz-Reynoso v. Barr, 968 F.3d 1070, 1076 (9th Cir. 2020); Canales-Rivera v. Barr, 948 F.3d 649, 654 (4th Cir. 2020); Koudriachova v. Gonzales, 490 F.3d 255, 261 (2d Cir. 2007).

**3.**

In sum, we conclude that the petition for review must be granted as to the challenge to the agency's denial of Pineda-

Maldonado's asylum application. The agency's denial of that application cannot be sustained on either the ground that Pineda-Maldonado has failed to show the requisite well-founded fear of being subject to mistreatment that would rise to the level of persecution or the ground that, in any event, Pineda-Maldonado has not shown the requisite nexus between the mistreatment to which he was subjected and a protected status. Accordingly, the BIA's decision denying Pineda-Maldonado's asylum application is vacated and remanded for further proceedings consistent with this decision.

## C.

That leaves only Pineda-Maldonado's petition for review of the agency's denial of his claim for withholding of removal. The agency denied Pineda-Maldonado's claim for withholding of removal on the ground that the standard for demonstrating entitlement to such withholding is higher than the standard for demonstrating entitlement to asylum and thus that because Pineda-Maldonado failed to show the latter he also failed to show the former. See Villalta-Martinez, 882 F.3d at 23. But, for the reasons we have explained, we find that the agency erred in denying Pineda-Maldonado's petition for asylum. We therefore conclude that the agency's denial of Pineda-Maldonado's claim for withholding of removal on the ground that his asylum application was denied is also in error. And because the agency provided no

- 30 -

other justification that could suffice to sustain that denial, we grant Pineda-Maldonado's petition for review of the denial of his claim for withholding of removal.[5]

**V.**

For the foregoing reasons, we **grant** Pineda-Maldonado's petition for review of the denial of his application for asylum and his claims for withholding of removal and protection under the Convention Against Torture.  We vacate the BIA's decision and remand for further proceedings consistent with this opinion.

---

[5] We recognize there is a circuit split as to whether the "one central reason" standard is the proper nexus standard in mixed-motive cases for both asylum and withholding of removal or if withholding of removal is subject to a lower "a reason" standard, whether "central" or not.  Compare Barajas-Romero v. Lynch, 846 F.3d 351, 358-60 (9th Cir. 2017) (holding that the proper standard for withholding of removal is "'a reason' rather than 'one central reason'" and that the "a reason" standard is "less demanding"), and Guzman-Vazquez v. Barr, 959 F.3d 253, 272-73 (6th Cir. 2020), with Gonzalez-Posadas v. Att'y Gen., 781 F.3d 677, 685 n.6 (3d Cir. 2015) ("We believe that the [BIA's] decision in Matter of C-T-L- to extend the 'one central reason' test to withholding of removal was sound and we likewise adopt that conclusion now."), and Quituizaca v. Garland, 52 F.4th 103, 113-14 (2d Cir. 2022). But, as we conclude that Pineda-Maldonado's challenge succeeds under even the "one central reason" standard, we need not address the issue here.  See Chavez v. Garland, 51 F.4th 424, 430 n.4 (1st Cir. 2022).