# United States Court of Appeals
## For the First Circuit

No. 23-1894

EUCINEIA SOARES DA SILVA PAZINE,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION
APPEALS

Before

Gelpí, Thompson, and Montecalvo,
<u>Circuit Judges</u>.

Caitlyn Burgess, with whom Kevin P. MacMurray and MacMurray & Associates were on brief, for petitioner.
Neelam Ihsanullah, Trial Attorney, United States Department of Justice, Civil Division, Office of Immigration Litigation, with whom Brian M. Boynton, Principal Deputy Assistant Attorney General, United States Department of Justice, Civil Division, and Anthony C. Payne, Assistant Director, United States Department of Justice, Civil Division, Office of Immigration Litigation, were on brief, for respondent.

August 27, 2024

**THOMPSON, <u>Circuit Judge</u>**.  Not all harm that a noncitizen suffered or fears suffering in their home country entitles them to asylum.  Part of the reason for that is asylum law's nexus requirement.  Here's what we mean by that.  By statute, a successful asylum applicant must demonstrate that they are a "refugee."  8 U.S.C. § 1101(a)(42)(A).  This in turn requires that they demonstrate they suffered or have a well-founded fear of suffering harm in their home country that amounts to "persecution" and that persecution is "<u>on account of</u>" at least one of five statutorily protected grounds:  "race, religion, nationality, membership in a particular social group [("PSG")], or political opinion."  <u>Id.</u> (emphasis added).  This "on account of" language requires a causal connection (or nexus, as it is most commonly dubbed) between the harm the noncitizen suffered or fears suffering and one of the five statutorily protected grounds.  Without a sufficient showing as to nexus, the harm the noncitizen suffered or fears suffering isn't a ground for asylum and their asylum claim will fail right out of the gate.  And this nexus requirement is what today's case is all about.

Before us, we have an immigration appeal, which rises or falls on whether Petitioner Eucineia Soares da Silva Pazine ("Soares da Silva Pazine") made a sufficient showing as to nexus. An Immigration Judge ("IJ") didn't think so, citing a lack of evidence in the record.  The Board of Immigration Appeals ("BIA"

- 2 -

and, collectively with the IJ, "the agency") agreed with that assessment. Viewing the record quite differently than the agency did and hoping to prevent her removal to her home country of Brazil, Soares da Silva Pazine filed a petition for review with this court. After taking a look ourselves, however, we conclude that the agency's no-nexus finding is sufficiently supported by the record and, therefore, we must deny the petition.

## THE WHO, WHAT, WHERE, WHEN, AND WHY

To start off today's appeal, we lay out the who, what, where, when, and why of Soares da Silva Pazine's journey to the United States, her case, and its path to our bench. In doing so, we gather our information from the administrative record, including Soares da Silva Pazine's in-court testimony, see Caz v. Garland, 84 F.4th 22, 25 n.2 (1st Cir. 2023), which the IJ found "generally credib[le]."

### *Life in Brazil*

Soares da Silva Pazine was born and raised in Resplendor, Brazil "and had a good childhood." Around March 2003, when she was about sixteen years old, she met Lucas Luiz Pazine ("Pazine"), who she married later that year in November. Their first child, a boy who we'll refer to as L.E.D.S.P., was born on October 14, 2004. The three of them lived together in Brazil and, during that time, Pazine, while not physically abusive, "was very temperamental and would often be aggressive towards" Soares da

- 3 -

Silva Pazine. He would at times "make punching motions" in her direction "but stop just before coming into contact with" her, which she found "terrifying." In 2009, Pazine moved to the United States, and, in February 2011, Soares da Silva Pazine followed suit with L.E.D.S.P. in tow "to study," "to be with [her] husband," and "to have a stable family."

*Life in the United States*

Upon Soares da Silva Pazine's arrival to the United States, Pazine "became much more abusive." As she was now "going to school and meeting new people," he became very jealous and "would often take [her] phone away and check it, search through [her] bag and belongings, and generally tr[y] to keep track of everything [she] did."

One night in or around November 2011, Pazine attacked Soares da Silva Pazine for the first time. After she came home from class, he "grabbed [her] by the throat aggressively," "repeatedly hit [her] in the face with a closed fist," and "tried to strangle [her]." Soares da Silva Pazine managed to get away from him and locked herself in a room, during which time he "grabbed a knife and pursued [her] and broke a wall trying to get to [her]." While locked in the room, she called his employer, who came to their home, "saw the chaos," "protected [her] from [Pazine,] and escorted [her] to the hospital." Pazine "insisted

- 4 -

on coming to the hospital," which made Soares da Silva Pazine "not feel safe to report [him] for attacking [her]."

A few months later, in or around February 2012, Soares da Silva Pazine decided to leave Pazine and bought herself an airplane ticket back to Brazil.  He, however, found out about her plan and "contacted both of [their] families, who contacted [her], and convinced [her] to give him a second chance."  That second chance, it turned out, didn't lead to any lasting change in Pazine's behavior.

To the contrary, while he "was a better husband" for about a year and a half, "he returned to his abusive ways" by September 2013, after their second child, a girl, was born.  For example, Pazine "became controlling and began to treat [Soares da Silva Pazine] cruelly again," such as by "tak[ing] [her] phone and look[ing] through it, forbid[ding] [her] from going out of the house, and search[ing] [her] belongings."  That wasn't even the extent of it.  He "also began drinking every day," often "com[ing] home from a night of drinking and break[ing] items in [their] home."  To make matters worse, he would also "brag to [her] that he was having sexual relations with other women," because she was "not fulfill[ing] [her] duties as a wife."  Along these same lines, he would tell her that she "ha[d] to submit to what he wanted" and would sometimes sexually assault her.

Wanting to escape this torment but financially unable to leave Pazine, Soares da Silva Pazine "decided to start saving money to build a home for [her] and [her] children in Brazil." Noticing that she was working hard and making a decent amount of money, Pazine "temporarily changed his ways," only to revert back to his abusive tendencies after their third child, another boy, was born in October 2017.

Things reached a boiling point in or around May 2020, when Soares da Silva Pazine asked Pazine "to leave [their] house for good." This request enraged Pazine, who, on May 28, 2020, attacked Soares da Silva Pazine again. That night, he chased her throughout their home, forcing her to lock herself in a bedroom to get away from him. Pazine, nevertheless, broke into the room and "began to punch and attack" Soares da Silva Pazine until their eldest son L.E.D.S.P. got in between them to protect her. L.E.D.S.P. was accidentally hit in the process, prompting Pazine to flee their home. Although the Woburn, Massachusetts Police Department was eventually called, Soares da Silva Pazine told them that she wasn't physically harmed during the attack because she feared Pazine would be deported.

Following this attack, Soares da Silva Pazine moved to a different apartment with their three children, but Pazine continued to call, text, and threaten her. His cousin, Dulce, would also call and threaten Soares da Silva Pazine "that [Soares

da Silva Pazine] had to see [Pazine] and support [Pazine] or else she would make [Soares da Silva Pazine's] life difficult." Ultimately, these continued threats convinced Soares da Silva Pazine that she had to be as far away from Pazine as possible, so she decided to return to Brazil with her three children. After receiving written authorization from Pazine to bring the children to Brazil, Soares da Silva Pazine and the three children left the United States on or around March 15, 2021.

*Return to Brazil*

Things didn't really improve much for Soares da Silva Pazine in Brazil. Although she "reconnected with [her] family and [Pazine's] family who [she] was familiar with," he "called his family and told them that he would not support [her] financially" and "told [their] families that [she] had mental disorders and was incapable of watching [their] children." Enraged that Soares da Silva Pazine left the United States with their children (even though he supposedly gave her written permission to do just that), Pazine told her over the phone that he "would do something to take the kids" and that he "would harm or kill [her] if he could."

While in Brazil, Soares da Silva Pazine would at times allow Pazine's parents to visit the children. During some of these visits, Pazine's parents would bring Dulce along, but Soares da Silva Pazine never approved of her coming to visit because of Dulce's prior threats to her. According to Soares da Silva Pazine,

- 7 -

Dulce came to these visits "on behalf of [Pazine] to monitor the situation and report on [her]." Dulce would also "threaten" her during these visits "that [Dulce] was not satisfied that [Soares da Silva Pazine and the children] were there" and "[t]hat [Dulce] will remove [their] children."

Over the next two months, Dulce began to surveil Soares da Silva Pazine's home, though she never harmed her physically. Dulce "would walk around the block [Soares da Silva Pazine's] home was on and take pictures" and then "would wait outside and monitor [her] schedule trying to memorize when and where [she] would be." This surveillance took place nearly every day and Dulce frequently told Soares da Silva Pazine that she "would not have peace." Soares da Silva Pazine also began receiving phone calls from someone threatening to kill her and take her children. Although she did not recognize the voice on the other line, she believed they were connected to Dulce.

These were not the only calls Soares da Silva Pazine received during her time in Brazil. She also received calls "every day" from lawyers in Brazil who Pazine had hired to "harass" her. "One [lawyer] was more threatening and did not identify himself while the other was only coercive and would try and pursue [her] to sign [her] home [in Brazil which she owns] over to [Pazine]." These lawyers also threatened to "accuse [her] of being unfit to raise [their] children in an attempt to take [her] home away from

[her]." Ultimately, these lawyers wanted her "to sign the paperwork for divorce and giv[e] up [her] children and [her] house."

"[V]ery fearful" of what would happen to her, Soares da Silva Pazine reported all of these calls and threats to the Brazilian police who told her that "these were conjugal problems" so nothing could be done about them. In light of these continued threats, Soares da Silva Pazine, along with L.E.D.S.P., fled Brazil on or about July 12, 2021 to return to the United States.[1]

*Return to the United States*

On or about July 16, 2021, Soares da Silva Pazine and L.E.D.S.P. entered the United States. Less than a month later, on August 5, 2021, the Department of Homeland Security ("DHS") initiated removal proceedings against them both. Over the next year or so, Soares da Silva Pazine continued to receive threats from Pazine's family and Pazine himself, who had since obtained a divorce against her in the United States. While Soares da Silva Pazine was unsure of Pazine's exact location, she knew he remained in the United States.

*The IJ's Decision*

Not too long after, on September 14, 2022, Soares da Silva Pazine and L.E.D.S.P. went before the IJ to seek immigration

---

[1] The other two children joined Soares da Silva Pazine and L.E.D.S.P. in the United States a few weeks later in August 2021.

relief and avoid removal back to Brazil. Soares da Silva Pazine sought immigration relief through applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), whereas L.E.D.S.P. only sought immigration relief through an application for derivative asylum.[2] To corroborate their claims and applications, they filed a trove of documents, including a sworn, written affidavit from Soares da Silva Pazine, her wedding certificate, L.E.D.S.P.'s birth certificate, various letters of support, including one from L.E.D.S.P. himself, a report on the effects of trauma, several country conditions reports, and a legal memorandum.

---

[2] To paint a crystal-clear picture of what went down at this hearing, we offer a few additional points of clarification.

First, derivative asylum refers to the fact that certain family members of asylees can be granted asylum as derivatives (or "riders" as they are also sometimes called) of their family member's asylum application. Cabrera v. Garland, 100 F.4th 312, 315 n.1 (1st Cir. 2024). On the other hand, noncitizens cannot derive withholding of removal or CAT protection, so in order to apply for those forms of relief, they must submit an application in their own name. Id. L.E.D.S.P., though, did not submit any applications in his own name, so his only path to immigration relief was derivative asylum.

Second, the IJ also considered two motions at the hearing: a motion to sever L.E.D.S.P.'s case from Soares da Silva Pazine's and a motion for administrative closure on behalf of both individuals. Administrative closure is a procedural mechanism that temporarily removes a noncitizen's case from an IJ's calendar and the BIA's docket but does not constitute a final order. Lopez-Reyes v. Gonzales, 496 F.3d 20, 21 (1st Cir. 2007). For reasons not ultimately relevant to the issues on appeal, both motions were denied.

After Soares da Silva Pazine was done testifying in accordance with everything detailed above,[3] the IJ denied all forms of immigration relief and ordered their removal to Brazil in an oral decision issued that day. The IJ started off his decision with credibility and corroboration. He noted that, even though he found Soares da Silva Pazine's testimony "generally credib[le]," she failed to provide certain evidence that he "deem[ed] to be reasonable, available corroborative evidence"[4] and she did "not adequately explain[]" the failure to produce such evidence. "Even if the[se] corroborative deficiencies . . . did not undermine [Soares da Silva Pazine's] ability to meet [her] burden of proof," the IJ explained, her asylum claim failed on the merits.

Per the IJ, Soares da Silva Pazine's asylum claim failed for several reasons. First, while the IJ lamented "the heinous acts of violence and mistreatment that [Pazine] inflicted against both [Soares da Silva Pazine] and [L.E.D.S.P.]," he noted that that harm occurred in the United States and the "refugee" definition outlined above "necessarily requires that the

---

[3] Soares da Silva Pazine was the sole witness to testify before the IJ.

[4] Specifically, the IJ determined that she failed to provide four relevant and reasonably available pieces of evidence: (1) the medical records from her hospitalization in 2011, (2) the police report from the Woburn Police Department, (3) the written authorization Pazine supposedly gave her to take the children to Brazil, and (4) the divorce paperwork.

persecution occur or that an applicant have a well-founded fear of persecution on account of a protected ground in the applicant's country of nationality or country of last habitual residence." According to the IJ then, "the mistreatment that [Soares da Silva Pazine] and [L.E.D.S.P.] suffered at the hand[s] of [Pazine] does not constitute past persecution since it occurred in the United States." And because Pazine was still in the United States, the IJ similarly concluded that Soares da Silva Pazine did not have a well-founded fear of future persecution at the hands of Pazine in Brazil as the IJ "would only be speculating as to whether or not [Pazine] would be returning to Brazil."

Second, the IJ concluded that Soares da Silva Pazine did not suffer past persecution nor did she have a well-founded fear of future persecution on account of a protected ground by way of the threats she received from Dulce and Pazine's lawyers. In reaching that conclusion, he first looked to the statutorily protected grounds Soares da Silva Pazine advanced in her briefing, her membership in three PSGs: "Brazilian Women," "Brazilian Females," and "Single Brazilian Mothers." The IJ acknowledged that these PSGs "could be legally cognizable and that it appears that [Soares da Silva Pazine] may belong to such groups" but explained that there was "[in]sufficient evidence in the record that a central reason for the harm [from Dulce and Pazine's lawyers] was on account of these proposed [PSGs] as opposed to a

personal dispute." Rather, the IJ maintained, "the harm directed against [her] from [Dulce] and the attorneys appears to be rooted in a custody dispute regarding the children and a property dispute." Laying it all out on the table, the IJ pointed out that "there is no evidence that [Dulce] was motivated to harm [her] because of her statuses of Brazilian women or female or as a status of a single Brazilian mother as opposed to her taking up a personal dispute between her and her husband [Pazine]." Likewise, the IJ highlighted that "the attorneys . . . appear to have been motivated to carry out [Pazine's] wishes as their client to gain custody of the children and [Soares da Silva Pazine's] property."

While the IJ considered the possibility of "any potential transferred intent" and noted that Pazine himself may have been motivated to harm Soares da Silva Pazine on account of her membership in her proposed PSGs, "the key issue," the IJ emphasized, was "whether the people that [she] fears, specifically [Dulce] or the attorneys of [Pazine], were motivated on account of the [PSGs] proposed." And on that key issue, the IJ concluded "that the intent of [Dulce] and the attorneys is rooted in their desire to help [Pazine] gain custody of the children successfully in the divorce and also gain a successful divorce and gain property." Without a nexus to a protected ground, the IJ found that Soares da Silva Pazine's asylum claim "fail[ed]."

Trudging along to the other forms of immigration relief, the IJ quickly denied withholding of removal because, like asylum, it requires a nexus to a statutorily protected ground but, unlike asylum, it has a higher burden of proof, which all meant that Soares da Silva Pazine's application for withholding of removal necessarily failed too. As for CAT protection, the IJ explained that there was insufficient evidence in the record that Soares da Silva Pazine would more likely than not be tortured in Brazil at the hands of or with the consent, acquiescence, or willful blindness of a public official. The IJ thought this was especially true here, where Soares da Silva Pazine had never been tortured in Brazil and "remained in Brazil for a number of months without any type of actual physical harm or mistreatment." In light of this absence of evidence, the IJ denied CAT protection and ordered Soares da Silva Pazine and L.E.D.S.P. removed to Brazil.

Soares da Silva Pazine followed up with an appeal to the BIA.[5]

*The BIA Decision*

The BIA dismissed the appeal a year later, on September 27, 2023. Starting off with what wasn't being challenged on appeal, the BIA noted that Soares da Silva Pazine had not

---

[5] For reasons unclear from the record, L.E.D.S.P. was not included in his mother's appeal to the BIA (nor, for that matter, in her petition for review to us). As such, the balance of our opinion today will focus on just Soares da Silva Pazine's case.

challenged the IJ's denial of CAT protection[6] nor the IJ's conclusion that the harm Pazine subjected her to did not fall within the definition of "refugee" because it occurred in the United States, and not in Brazil. It then shifted its focus to Soares da Silva Pazine's challenge to the IJ's no-nexus finding as it related to Dulce and Pazine's lawyers. It "discern[ed] no clear error" in that no-nexus finding, which it found "plausible in light of the record." The BIA explained that "[w]hile [Soares da Silva Pazine] interprets her evidence differently, her interpretation alone is not sufficient to show clear factual error in the [IJ's] motive finding." In the absence of any clear error, it agreed with the IJ that she had not established the nexus required for asylum or withholding of removal.[7] Furthermore, the BIA noted that, for the first time on appeal, Soares da Silva Pazine raised a "pattern or practice" theory of persecution,[8] which it refused to address because she had not presented the theory to the IJ.

---

[6] In fact, Soares da Silva Pazine doesn't challenge the denial of CAT protection in her briefing to us either. This failure to challenge the denial of CAT protection before the BIA and this court means she (to the extent she is even still pursuing this relief) both failed to administratively exhaust her claim and waived it. See Caz, 84 F.4th at 30 n.7 (waiver); Odei v. Garland, 71 F.4th 75, 78 n.1 (1st Cir. 2023) (administrative exhaustion).

[7] Because the no-nexus finding was dispositive of her claims, the BIA explicitly declined to address any other findings made by the IJ.

[8] A "pattern or practice" theory of persecution is a fallback for noncitizens who cannot prove that they will personally be singled out for persecution on account of a protected ground in

- 15 -

A timely petition for review with this court followed and, with that, we're all up to date on the relevant goings-on and need-to-knows.

**THE HOW**

Up top we previewed that today's appeal will end with a denial of Soares da Silva Pazine's petition for review. What follows is how we get to that particular outcome. With CAT protection both unexhausted and waived, all we have left to review is the agency's denial of asylum and withholding of removal. And since "the BIA did not say that it was adopting the IJ's decision, only that the IJ's findings were not clearly erroneous," we limit our review to the BIA's decision, Aguilar-Escoto v. Garland, 59 F.4th 510, 515 (1st Cir. 2023), starting off with asylum and ending with withholding.

*Asylum*

On the asylum front, Soares da Silva Pazine makes many arguments on appeal: (1) the harm she suffered in Brazil rose to the level of persecution; (2) her proposed PSGs of "Brazilian Women," "Brazilian Females," and "Single Brazilian Mothers" are

---

their home country or country of last habitual residence. See Balachandran v. Holder, 566 F.3d 269, 272 (1st Cir. 2009). Instead, under such a theory, noncitizens can be granted asylum if they demonstrate "that there is a pattern or practice . . . of persecution of a group of persons similarly situated to the [noncitizen] on account of" at least one of the statutorily protected grounds and the noncitizen is a member of that group. 8 C.F.R. § 1208.13(b)(2)(iii)(A)-(B).

legally cognizable PSGs; (3) the BIA erred in refusing to address her "pattern or practice" theory of persecution; (4) the IJ erred in his determination that she failed to provide reasonably available corroborative evidence, which undermined her ability to meet her burden of proof; and (5) the agency erred in concluding she had not demonstrated a nexus to a statutorily protected ground. We need not reach most of these arguments.

The agency's no-nexus finding was outcome-determinative and it is black-letter law that "agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach," so the agency did not need to address Soares da Silva Pazine's harm-amounting-to-persecution argument or the validity of her PSGs. Immigr. & Naturalization Serv. v. Bagamasbad, 429 U.S. 24, 25 (1976) (citing Hirabayashi v. United States, 320 U.S. 81, 85 (1943)). As for the BIA's alleged error in declining to address her "pattern or practice" theory of persecution, nowhere in Soares da Silva Pazine's briefing does she challenge the BIA's assertion that she failed to raise this theory to the IJ, which constitutes waiver. See Caz, 84 F.4th at 30 n.7. And, importantly, a "pattern or practice" theory of persecution also requires a nexus showing, so the agency's no-nexus finding was, again, outcome-determinative. See Balachandran, 566 F.3d at 272. Lastly, besides the no-nexus finding, the BIA explicitly declined to address the IJ's other findings, including the

- 17 -

determination that Soares da Silva Pazine failed to provide reasonably available corroborative evidence. And where the BIA declines to address an IJ's alternative finding, that finding "is not before us." Bonilla v. Mukasey, 539 F.3d 72, 81-82 (1st Cir. 2008) (citing Immigr. & Naturalization Serv. v. Ventura, 537 U.S. 12 (2002)).

All that leaves us with just one argument to address regarding asylum: Soares da Silva Pazine's challenge to the no-nexus finding. And that challenge has two parts to it. First, she contends that the agency didn't engage in the proper mixed-motive analysis. Second, she contends that the record compelled the conclusion that her membership in the aforementioned PSGs was one central reason for the harm she suffered and fears suffering in the future. These contentions are essentially two sides of the same coin, which some background on nexus will help put in context.

As we mentioned above, asylum law's definition of "refugee" requires a showing of past persecution or a well-founded fear of future persecution "on account of" one of the statutorily protected grounds, 8 U.S.C. § 1101(a)(42)(A), and, without that on-account-of (or nexus) showing, an asylum claim won't make it very far, see Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217-18 (1st Cir. 2007). A noncitizen satisfies their burden as to nexus by demonstrating that a statutorily protected ground "was or will

be at least one central reason" for the harm they suffered or fear suffering. 8 U.S.C. § 1158(b)(1)(B)(i). This does not require the noncitizen to demonstrate that they were or will be targeted only because of their protected characteristic. Ordonez-Quino v. Holder, 760 F.3d 80, 90 (1st Cir. 2014). Rather, this capacious "at least one central reason" language recognizes the universal truth that it is common for persecutors to have mixed motivations. See id. The upshot of all this is that "the presence of a non-protected motivation" does not defeat a noncitizen's asylum claim. Aldana-Ramos v. Holder, 757 F.3d 9, 19 (1st Cir. 2014). Instead, all that is required of a noncitizen is a sufficient showing that the protected motivation was not "incidental, tangential, superficial, or subordinate to another reason for [the] harm." Sánchez-Vásquez v. Garland, 994 F.3d 40, 47 (1st Cir. 2021) (quoting Singh v. Mukasey, 543 F.3d 1, 5 (1st Cir. 2008)).

With that legal framework in place, we turn back to Soares da Silva Pazine's arguments. She essentially argues that (1) the BIA didn't properly consider the possibility of mixed motives, and (2) the record adequately showed that her membership in her PSGs was "at least one central reason" for the harm. But before getting to the meat of our analysis of those arguments, there are several important clarifications we must make regarding

which PSGs are at issue here and which persecutor's motivations are relevant to our nexus analysis.

First, while Soares da Silva Pazine proffered three PSGs to the IJ and the BIA -- namely, "Brazilian Women," "Brazilian Females," and "Single Brazilian Mothers" -- the substance of her briefing only addresses "Brazilian Women" with mere passing references to the other two PSGs. We, therefore, deem those other two PSGs waived, see Martínez-Pérez v. Sessions, 897 F.3d 33, 40 n.5 (1st Cir. 2018), and consider her nexus arguments vis-à-vis only her "Brazilian Women" PSG. Second, Soares da Silva Pazine never challenged in her briefing to us or to the BIA the IJ's conclusion that the abuse Pazine subjected her to in the United States could not be a basis for asylum because the "refugee" definition necessarily contemplates harm in the noncitizen's home country. With no argumentation on that point at all, we deem it waived and unexhausted, see id. (waiver); Odei, 71 F.4th at 78 n.1 (administrative exhaustion), and do not consider Pazine's United-States-based actions in our nexus analysis. Third, Soares da Silva Pazine makes a passing argument in her briefing to us that "the form of verbal abuse from [Pazine] while they lived together in Brazil" amounted to past persecution -- an argument which makes its debut before us (not before the IJ and not before the BIA). Her failure to properly develop this argument on appeal to us and her failure to present this argument to the agency at

all -- once again -- means the argument is waived and unexhausted. See Martínez-Pérez, 897 F.3d at 40 n.5 (waiver); Odei, 79 F.4th at 78 n.1 (administrative exhaustion).

What this all means for our purposes here today is that the only actors whose motivations are relevant are Dulce and Pazine's lawyers and what matters is whether the record sufficiently shows that "at least one central reason" for their actions against Soares da Silva Pazine was her membership in the "Brazilian Women" PSG.

With these important clarifications squared away, we at long last finally turn to the nitty-gritty of our analysis of Soares da Silva Pazine's appellate arguments. Her first argument -- that the BIA failed to engage in a mixed-motive analysis -- boils down to a contention that it applied the wrong legal standard, which is an argument we review de novo (or, more simply put, with fresh eyes). Jimenez-Portillo v. Garland, 56 F.4th 162, 166 (1st Cir. 2022). With our de-novo glasses on, we hardly see any merit to this argument. The BIA repeatedly cited the "at least one central reason" standard in its decision and then ran through specific facts in the record that supported the no-nexus finding. By doing so, it "necessarily 'acknowledged the possibility of a mixed-motive case, but based on the evidence presented, made a fact-specific determination that [Soares da Silva Pazine] had not shown that the persecution was motivated'" by a protected ground.

<u>Barnica-Lopez</u> v. <u>Garland</u>, 59 F.4th 520, 529-30 (1st Cir. 2023) (quoting <u>Villalta-Martinez</u> v. <u>Sessions</u>, 882 F.3d 20, 24 (1st Cir. 2018)). The BIA's decision, therefore, readily reflects that it "repeatedly cited to and correctly applied the 'one central reason' standard in examining the nexus between that protected ground and the harm [Soares da Silva Pazine] suffered."[9] <u>Id.</u> at 529.

Finding her first argument unpersuasive, all that remains for our review is her second argument that, even assuming the agency applied the correct "at least one central reason" standard, it erred in determining that her membership in the "Brazilian Women" PSG was not "at least one central reason" for the harm she suffered and fears suffering from Dulce and Pazine's lawyers. This is an argument we review under the substantial evidence standard, because whether a protected characteristic is a central reason for a noncitizen's persecution is generally a question of fact. <u>Singh</u>, 543 F.3d at 4. And under the substantial evidence standard, which is not "petitioner-friendly," <u>Ruiz</u> v. <u>Mukasey</u>, 526 F.3d 31, 35 (1st Cir. 2008), we reverse only if any reasonable fact-finder would be compelled to the opposite

---

[9] To the extent Soares da Silva Pazine argues that the IJ did not properly apply the mixed-motive standard and the BIA erred by failing to correct that error on appeal, we see no merit to that contention either for the same exact reasons. The IJ's decision reflects multiple invocations of the correct "at least one central reason" standard and a careful review of the record evidence as to Dulce's and Pazine's lawyers' intentions.

conclusion, <u>Immigr. & Naturalization Serv.</u> v. <u>Elias-Zacarias</u>, 502 U.S. 478, 483-84 (1992). For reasons we'll explain, we do not think the record compels the conclusion that Dulce and Pazine's lawyers targeted or will target Soares da Silva Pazine on account of her membership in the "Brazilian Women" PSG.

Soares da Silva Pazine seems to contend that Pazine himself was motivated to harm her on account of her gender and, because he "coordinated" the harm Dulce and his lawyers subjected her to, their actions are inextricably linked to his own motivations. In this way, she appears to be arguing that Pazine's motivations are either transferred or imputed to Dulce and his lawyers. Setting aside the fact that Soares da Silva Pazine offers no caselaw (nor are we aware of any) greenlighting the transferring of or imputing of one actor's motivations to another, we'll assume (favorably to her, but without deciding) that Pazine was indeed motivated to harm her on account of her gender and assume (again favorably to her, but without deciding) that such motivations can be transferred or imputed to Dulce and his lawyers, because her argument fails regardless. <u>See</u> <u>Cabrera</u>, 100 F.4th at 321 (assuming "favorably to Petitioners" the viability of their asylum argument because the "claim fails anyway").

To explain, even if Dulce and Pazine's lawyers were motivated to harm Soares da Silva Pazine at least in part due to her gender, she must nevertheless prove that the record compels

the conclusion that her gender was not "incidental, tangential, superficial, or subordinate to another reason for [the] harm." Sánchez-Vásquez, 994 F.3d at 47 (quoting Singh, 543 F.3d at 5). And that she cannot do. Let's start off with Dulce. Nothing in the record compels the conclusion that she was more than incidentally or tangentially motivated (if that) by Soares da Silva Pazine's gender as opposed to her desire to help her cousin Pazine obtain custody of the children -- as the agency concluded. For example, every threat Dulce made against her occurred when Soares da Silva Pazine was separated from Pazine and had taken their children. Moreover, none of the threats referenced her gender or used similar gender-based derogatory language that Pazine had previously used. There's also nothing in the record to suggest Dulce had previously targeted other Brazilian women due to their gender. Importantly, Soares da Silva Pazine testified herself that Dulce threatened her because "she wanted to do things bad to [her], take [her] children, [and] take [her] house," because Dulce was "[i]nfluenced by [Pazine]," who "wanted custody of [her] children and to take everything [she] had." Nothing in this explanation even references her gender as a motivating factor behind Dulce's actions. Ultimately, the agency reasonably concluded that Dulce was motivated to help her cousin in his personal dispute against Soares da Silva Pazine for custody and property and we've long recognized that "personal disputes are

generally not enough to show the required nexus."  Sompotan v. Mukasey, 533 F.3d 63, 71 (1st Cir. 2008).

We reach the same conclusion as to the motivations of Pazine's lawyers.  The only information in Soares da Silva Pazine's sworn, written affidavit about the lawyers is the following:

> [Pazine] hired two attorneys to harass me while I lived in Brazil.  Both would call me every day.  One was more threatening and did not identify himself while the other was only coercive and would try and pursue me to sign my home over to [Pazine].  [Pazine] wanted these lawyers to take my home and money from me.
>
> I own a home in Brazil and [Pazine], and his attorneys, have threatened to try and take my home from me by any means necessary.  The lawyers were going to accuse me of being unfit to raise our children in an attempt to take my home away from me.  They also were going to attempt to take my home through divorce proceedings, if those were to proceed.

Needless to say, nothing there even remotely suggests the lawyers' were motivated by Soares da Silva Pazine's gender.  The same is true of her in-court testimony.  Indeed, her in-court testimony strongly suggests the lawyers were motivated by their attorney-client relationship and obligation to do what their client, Pazine, hired them to do.  She testified that their "calls were essentially about custody and money" and "sign[ing] the paperwork for divorce and giving up [her] children and [her] house."  There's also nothing in the record from which we could even infer any gender-based motivation on the lawyers' part.  For

example, nothing in their actions or behavior suggests that they only take male clients or that they would not have engaged in such hard-boiled tactics had their client been Soares da Silva Pazine and not Pazine. As such, the agency's conclusion that the lawyers were similarly motivated by a personal dispute is well-supported by the record.

The only comeback Soares da Silva Pazine offers is that the boatload of country conditions evidence in the record demonstrates that Brazil is rife with impunity for gender-based violence, which (in her mind) supports her contention that Dulce and Pazine's lawyers had gender-based motivations. While this characterization of life in Brazil may well be true, that generalized country conditions evidence hardly illuminates Dulce's or the lawyers' specific motivations. See Laurent v. Ashcroft, 359 F.3d 59, 65 n.4 (1st Cir. 2004) ("But such generalized information cannot be allowed to trump the IJ's specific, well-substantiated finding . . . ."). This is especially true where neither Dulce nor the lawyers outwardly expressed any misogynist views.[10]

_____

[10] Other than the country conditions evidence, the only other relevant evidence is the aforementioned letters of support from various individuals, including L.E.D.S.P. and others familiar with what Soares da Silva Pazine and her children lived through. These letters, however, provide no insight as to Dulce's or the lawyers' motivations as the only reference to them at all in any of these letters is the following: "However, while [Soares da Silva Pazine

To recap, the agency concluded that there was no nexus between Soares da Silva Pazine's membership in the "Brazilian Women" PSG and the harm she suffered from Dulce and Pazine's lawyers.  For the reasons explained above, we believe substantial evidence supports that conclusion and, therefore, the agency did not err in denying asylum.

*Withholding of Removal*

Neither did the agency err in denying withholding of removal, which also requires a nexus showing but imposes a higher standard of proof than asylum.  Lopez de Hincapie, 494 F.3d at 220.  Having failed to satisfy asylum's standard of proof, Soares da Silva Pazine necessarily failed to satisfy withholding's standard of proof.[11]  See Cabrera, 100 F.4th at 324.

---

and the children] were [in Brazil], [Pazine] sent people who threatened her and her family with death."

[11] We take a beat to note that some of our sister circuits disagree as to whether the "one central reason" standard -- as opposed to a less stringent "a reason" standard -- applies to withholding of removal.  Compare Barajas-Romero v. Lynch, 846 F.3d 351, 359-60 (9th Cir. 2017) (endorsing "a reason" standard); Guzman-Vasquez v. Barr, 959 F.3d 253, 272 (6th Cir. 2020) (same) with Gonzalez-Posadas v. Att'y Gen. U.S., 781 F.3d 677, 685 n.6 (3d Cir. 2015) (endorsing the "one central reason" standard); Vazquez-Guerra v. Garland, 7 F.4th 265, 271 (5th Cir. 2021) (same); Quituizaca v. Garland, 52 F.4th 103, 108-14 (2d Cir. 2022) (same). See also Durakovic v. Garland, 101 F.4th 989, 996, 996 n.3 (8th Cir. 2024) (noting the circuit split and listing cases but declining to resolve the issue); Pineda-Maldonado v. Garland, 91 F.4th 76, 90 n.5 (1st Cir. 2024) (same); Chavez v. Garland, 51 F.4th 424, 430 n.4 (1st Cir. 2022) (same).  As we've routinely applied the "one central reason" standard to withholding of removal claims, see, e.g., Barnica-Lopez, 59 F.4th at 528; Marquez-Paz v. Barr, 983 F.3d 564, 565 (1st Cir. 2020); Costa v. Holder, 733 F.3d

- 27 -

**THE WRAP-UP**

As we wrap up, we wish to note that nothing in today's opinion is meant to discount the gravity of what Soares da Silva Pazine has lived through both in Brazil and the United States. That said, the record-related deficiencies as to nexus require that we <u>deny</u> the petition.

---

13, 16 (1st Cir. 2013), and neither party asks us to resolve the issue, we apply the "one central reason" standard here and leave the issue for another day.